The **HANOVER SHOE, INC.,** Plaintiff,

v.

**UNITED SHOE MACHINERY CORPO-
RATION,** Defendant.

Civ. No. 5395.

United States District Court
M. D. Pennsylvania.

April 28, 1965.

Supplemental and Amended Findings of
Fact, Conclusions of Law and
Opinion Aug. 12, 1965.

See, also, D.C., 207 F.Supp. 407.

Nogi, O'Malley & Harris, Scranton, Pa., Donovan, Leisure, Newton & Irvine, New York City, for plaintiff.

Warren, Hill, Henkelman & McMenamin, Scranton, Pa., Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for defendant.

SHERIDAN, Chief Judge.

## I.

## INTRODUCTION

This is a private antitrust action which arises under Section 2 of the Sherman Act, Act of July 2, 1890, c. 647, 26 Stat. 209, as amended, 15 U.S.C.A. § 2, and under Section 4 of the Clayton Act, Act of October 15, 1914, c. 323, 38 Stat. 731, 15 U.S.C.A. § 15, to recover treble damages for defendant's alleged monopolization of the shoe machinery industry, and, particularly, its alleged monopolistic practices with respect to substantially all shoe machinery required and used by plaintiff, The Hanover Shoe, Inc. (Hanover).

The complaint, as amended, alleges in paragraph 14 that "Prior to and continuously from the year 1912 the defendant, United Shoe Machinery Corporation [United], has been violating the antitrust laws of the United States by: (a) monopolizing interstate trade and commerce in the shoe machinery industry of the United States; (b) monopolizing interstate trade and commerce of the United States in "substantially all shoe machinery required and used by Hanover in the manufacture of men's and boys' shoes." In paragraph 15 it is alleged that "Monopolization by United as aforesaid and the exercise by it of its monopoly powers has enabled United to dominate and control the market in shoe machinery, to restrict actual competition and to exclude potential competition in said market."

The complaint then sets forth allegations with respect to the principal means used by United to accomplish the violation of law. It is alleged that "At all times prior to May 17, 1954, the date of

the decision of the United States Supreme Court affirming a judgment that United violated Section 2 of the Sherman Act by monopolizing the shoe machinery trade and commerce among the several States, United declined to sell most of its shoe machines and made such machines available to shoe manufacturers only upon leases * * * " and that United "offered on lease only all of the major, important machines used by Hanover" in the shoe manufacturing operations described in other paragraphs of the complaint. It is alleged that United's leases for most of its machines, including all such leases with Hanover, provided flat rental charges or unit rental charges based on the number of shoes produced or on the number of operations performed by the machines, and on the rest of its machines, including those on lease to Hanover, provided for payment of both rental and unit charges. It is alleged that in these leases, the 10 year term, full capacity, minimum charge, and machine return clauses, alone or in combination with one or more of the other clauses, deter and prevent shoe manufacturing lessees, including Hanover, from replacing with a competitive machine each of the machines leased from United.

Other means used by United to deter competition are alleged to be the establishment of a "right of deduction fund" whereby a percentage of rentals was set aside by United to be applied by United, if desired by the lessee, to machine return charges or minimum rental charges; the requirement that lessees pay transportation and parts replacement costs, and a sum equaling either 25 or 50 percent of the remaining rental for the term if a lessee, including Hanover, desired to replace a United machine with that of a United competitor; and United's voluntary assumption of machine repair with no separate charge to the lessee, thereby deterring the establishment and growth of competitive repair service organizations. The complaint alleges that as a further means of preventing competition, United, when faced with competition, reduced its own rates on machinery types threatened by competition; introduced new models at lower rates than those rates for comparable old models; maintained rates on a particular machine type despite a policy of increasing rates on other machine types to meet increased costs of manufacture; and introduced new models so designed and priced as to reach only that area of the shoe manufacturing industry in which a competitor was attempting to market a machine.

Hanover alleges that these practices affected it in the following ways: (a) United collected from Hanover excessive, arbitrary and non-competitive rental, unit and other charges for its products and services; (b) Hanover was prevented from acquiring shoe machinery, new or used, as owner either from United or elsewhere; (c) United extracted from Hanover for the use of its shoe machinery, large sums of money in excess of the reasonable value of such machinery and of the service rendered by United on such machinery.

Hanover claims damages of $2,000,000, and pursuant to the treble damage provisions of the Clayton Act, requests judgment of $6,000,000.

In its answer United denied many of the significant allegations of the complaint and set up as affirmative defenses the statute of limitations, laches, estoppel, waiver and acquiescence on the part of Hanover. United also contends that its pre-eminence in the shoe machinery industry is due to its initiative and enterprise and its business methods, which were adopted to promote success of manufacturers generally, and has been accompanied by an increase of opportunity for Hanover.

The action was tried to the court without a jury.

## II.

### FINDINGS OF FACT, CONCLUSIONS OF LAW

A. Background:

Plaintiff, The Hanover Shoe, Inc., is a corporation organized and existing under the laws of the State of Pennsylvania,

with its principal office and place of business in Hanover, Pennsylvania.

Defendant, United Shoe Machinery Corporation, is a corporation organized and existing under the laws of the State of New Jersey, with its principal office and place of business in Boston, Massachusetts, and also with offices and a place of business in Harrisburg, Pennsylvania, within this district.

Since 1899 Hanover has engaged in the manufacture of men's shoes by the Goodyear welt process, and until the early 1950's also engaged in the manufacture of boys' shoes by the same process. Except for large quantities of military shoes manufactured during World War II, and for shoes sold to Montgomery Ward and J. C. Penney since World War II, Hanover has sold the shoes it manufactured directly through retail men's shoe stores operated by its wholly owned subsidiary, Sheppard & Myers, Inc. There are currently about 110 retail stores. Hanover's manufacture of shoes during the period from 1939, the beginning of the complaint period of this action, to 1955, the year in which the action was instituted, ranged in volume from a low of 1,006,768 pairs in 1939 to a high of 1,939,289 pairs in 1944. In 1955 Hanover was one of the 35 largest of approximately 1,000 shoe manufacturers in the United States.

Until 1956 all of the capital stock of Hanover was owned by or for the benefit of H. D. Sheppard or C. N. Myers, the original shareholders, or members of their families, except for small blocks of stock sold to key employees, beginning in 1940. In 1956 approximately 25 percent of the then outstanding capital stock was sold to the public.

United is the successor of a combination of shoe machinery companies which consolidated in 1899. Since that time United has engaged in the manufacture and distribution of shoe machinery. Most of the machinery was manufactured at its factory in Beverly, Massachusetts, and was distributed in interstate commerce to shoe manufacturers, which included machinery supplied to Hanover at its principal plant in Hanover, Pennsylvania, and at its other factories in East Berlin, Pennsylvania, and Middletown and Emmitsburg, Maryland.

Most of the important operations in Hanover's manufacture of shoes are done by machine, and Hanover could not engage competitively in quantity production without the use of shoe machinery.

During the complaint period United made available its more complicated machines to shoe manufacturers, including Hanover, on leases only. The more complicated machines are those which have greater importance in the manufacture of shoes. These machines produced the largest revenue for United. In 1951 United had 178 machine types on a lease-only basis. The complaint in this action relates to United's practices with respect to 58 such machine types which Hanover had on lease during the complaint period. The rental for these machines was either a stated amount, a stated amount plus royalties, or royalties only, payable monthly. Of the 58 machine types, 20 accounted for more than 80 percent of the rentals and royalties paid United by Hanover during the complaint period, and 18 of the 20 types were on a royalty or royalty plus rental basis.

United also marketed machines less complicated than the major machines, on an alternate lease or sale basis, at the customer's option. In 1951 United had 122 of these machine types, hereafter referred to as optional machines. The rental for these machines was on a flat rate basis, payable monthly.

In 1951 United had 42 machine types available for purchase only.

All new leases to shoe manufacturers, including Hanover, of machinery involved in this action were for 10 year terms. Renewal leases were for 5 years. From 1922 to May 17, 1954, all of United's leases were substantially uniform. They are known as "Form A" leases. Three clauses

important to this action are the full capacity, term, and return charge.[1] A fourth clause, Clause 2, provided, among other things, that the lessee shall at all times and at his own expense keep the machinery in good and efficient working order, and in the event that the lessee shall fail to do so, United may cause the machinery to be put in such order at the expense of the lessee.[2]

In 1947 the United States instituted a civil action against United in the United States District Court for the District of Massachusetts, Civil Action No. 7198, alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2. On February 18, 1953, Judge Wyzanski handed down findings of fact, conclusions of law, opinions, and a decree which found that United violated Section 2 of the Sherman Act. United States v. United Shoe Machinery Corporation, D.Mass. 1953, 110 F.Supp. 295. On May 17, 1954, the Supreme Court of the United States affirmed per curiam the judgment of the District Court. 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910. This action will hereinafter be referred to as the Government case.

B. United's Market Position:

As of about May, 1947, United's share of the market of 56 of the 58 lease-only machine types leased by Hanover—there being no data in evidence as to the remaining two—was as follows:

| | |
|---|---|
| 100% | — 10 types |
| 99% | — 14 types |
| 98% | — 7 types |
| 97% | — 4 types |
| 96% | — 5 types |
| 90–95% | — 9 types |
| 85–89% | — 1 type |
| 80–84% | — 3 types |
| 55–69% | — 3 types |
| | 56 |

Of the 20 major machine types included in the 56, the rentals and royalties of which accounted for more than 80 percent

1. "Machine Use 5. The leased machinery shall be used for no other purpose than for performing the operations for which it is designed in the manufacture of boots, shoes or other footwear made by or for the lessee. Subject to the foregoing limitations, the lessee shall use the leased machinery to its full capacity upon all boots, shoes or other footwear or portions thereof made by or for the lessee in the manufacture or preparation of which such machinery is capable of being used, and the provision herein contained shall not be construed to be limited in any way by the number of pairs designated in column VI in the foregoing Schedule of Machines. " * * *

"Term of Lease 12. The lease hereby granted in respect to each machine hereby leased shall continue, unless sooner terminated by the United Corporation because of breach thereof on the part of the lessee or otherwise as herein provided, for the period of ten years from the date hereof. * * * " * * *

"Return of Machines 14. Upon the termination in any manner whatever of the lease hereby granted or any extension thereof in respect to any machine hereby leased the lessee shall forthwith deliver such machine to the United Corporation, at Beverly, Massachusetts, complete and in good order and condition, reasonable wear and tear alone excepted, and shall pay to the United Corporation in respect to Payment each such machine the amount (if any) set opposite the name thereof in column VII in the foregoing Schedule of Machines. The lessee shall also pay to the United Corporation such sum as may be necessary to cover replacement at the regular prices established by the United Corporation therefor of all broken or missing parts."

The complaint also sets forth the monthly minimum charge on unit charge machine clause as a means whereby United monopolized the shoe machinery industry to the detriment of lessees, including Hanover. In its brief and proposed findings of fact and conclusions of law, however, Hanover did not point to this clause as a means of monopolization.

2. It is the conduct of United under this clause, rather than the clause itself, that Judge Wyzanski found to be a means by which United controlled the shoe machinery market.

of the charges Hanover paid United, United's market share was:

| | | |
|---|---|---|
| 100% | — | 4 types |
| 99% | — | 6 types |
| 98% | — | 4 types |
| 97% | — | 3 types |
| 89–93% | — | 3 types |
| | | 20 |

There is no evidence that United suffered any appreciable limitation in its share of the market with respect to these machine types prior to the filing of the complaint. With respect to domestic machines, there is no evidence of any change whatever. As to foreign machines, a tabulation for 23 machine types, 15 of which are comparable in function with United's machines leased by Hanover, shows that 538 machines were installed in factories since January 1, 1947, and 403 of these were outstanding on August 1, 1955. On May 1, 1947, United had 115,787 machines outstanding. Since January 1, 1947, there have been 323 installations of the 15 types Hanover leased from United, of which 104 were clickers. On August 1, 1955, 233 were outstanding, of which 86 were clickers. The influence that these machines had on the dominance of United's position is inconsequential. Until 1955 United enjoyed an overwhelming share of the shoe machinery market which it controlled.

## C. The Antitrust Violation:

### 1. The Findings and Decree in the Government case.

Hanover relies primarily on the decree, findings, conclusions, and opinions in the Government case, as proof of United's illegal monopolization of the shoe machinery industry in the United States, pursuant to Section 5 of the Clayton Act, 15 U.S.C.A. § 16, which provides:

"(a) A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: * * * *"

United urges that even with the aid of the decree in the Government case, Hanover has not proved a monopolization; that the four clauses in the Form A lease, the ten year term, the full capacity, the deferred payment or return charge, and the repair clause, were the only factors relied on by Judge Wyzanski as the basis of his decree; that these clauses were not in their actual operation restrictive or monopolizing practices, and had no effect on Hanover; and that all other charges were dismissed with prejudice.

The findings, conclusions and decree in the Government case show that the four clauses of the Form A lease, and also the lease-only system were in their operation restrictive or monopolizing practices.[3]

---

3. The court clearly indicated this in the following parts of its opinion (page numbers refer to 110 F.Supp.).

"The effect of United's leasing system as it works in practice may be examined from the viewpoints of United, of the shoe manufacturers, and of competitors potential or actual. p. 323

"Yet as already noted, a shoe manufacturer may psychologically or economically be more impeded by a leasing than by a selling system. And this general observation is buttressed by a study of features in the United leasing system which have a special deterrent effect. Though these features are stated separately, and some of them alone are important impediments, they must be appraised collectively to appreciate the full deterrent effect. p. 324

"However, United's leases, in the context of the present shoe machinery market, have created barriers to the entry by competitors into the shoe machinery field. p. 340

"First, the complex of obligations and rights accruing under United's leasing system in operation deter a shoe manu-

The court spoke of the lease-only system, and its "features" which have a "special deterrent effect"; the lease-only system and the "complex of obligations and rights", accruing thereunder which "in operation" deter a shoe manufacturer from disposing of United's and acquiring a competitor's machine; the distribution of machines only on leases which "assure closer and more frequent contacts" with

facturer from disposing of a United machine and acquiring a competitor's machine. He is deterred more than if he owned that same United machine, or if he held it on a short lease carrying simple rental provisions and a reasonable charge for cancellation before the end of the term. The lessee is now held closely to United by the combined effect of the 10 year term, the requirement that if he has work available he must use the machine to full capacity, and by the return charge which can in practice, through the right of deduction fund, be reduced to insignificance if he keeps this and other United machines to the end of the periods for which he leased them. p. 340

"Second, when a lessee desires to replace a United machine, United gives him more favorable terms if the replacement is by another United machine than if it is by a competitive machine. p. 340

"Third, United's practice of offering to repair, without separate charges, its leased machines, has had the effect that there are no independent service organizations to repair complicated machines. In turn, this has had the effect that the manufacturer of a complicated machine must either offer repair service with his machine, or must face the obstacle of marketing his machine to customers who know that repair service will be difficult to provide. p. 340

"If the matter were *res integra*, this Court would adopt the first approach, and, as a preliminary step to ruling upon § 2, would hold that it is a restraint of trade under § 1 for a company having an overwhelming share of the market, to distribute its more important products only by leases which have provisions that go beyond assuring prompt, periodic payments of rentals, which are not terminable cheaply, which involve discrimination against competition, and which combine in one contract the right to use the product and to have it serviced. p. 343

" * * * In the relatively static shoe machinery market where there are no sudden changes in the style of machines or in the volume of demand, United has a network of long-term, complicated leases with over 90% of the shoe factories. These leases assure closer and more frequent contacts between United and its customers than would exist if United were a seller and its customers were buyers.

Beyond this general quality, these leases are so drawn and so applied as to strengthen United's power to exclude competitors. * * * p. 343

" * * * These considerations would all affect *potential* competition, and have not been without their effect on *actual* competition. p. 344

"Much of United's market power is traceable to the magnetic ties inherent in its system of leasing, and not selling, its more important machines. The lease-only system of distributing complicated machines has many 'partnership' aspects, and it has exclusionary features such as the 10-year term, the full capacity clause, the return charges, and the failure to segregate service charges from machine charges. Moreover, the leasing system has aided United in maintaining a pricing system which discriminates between machine types. p. 344

" * * * the leasing system and the miscellaneous activities just referred to * * * are contracts, arrangements, and policies which, instead of encouraging competition based on pure merit, further the dominance of a particular firm. In this sense, they are unnatural barriers; they unnecessarily exclude actual and potential competition; they restrict a free market. * * * pp. 344–345

" * * * United is denied the right to exercise effective control of the market by business policies that are not the inevitable consequences of its capacities or its natural advantages. That those policies are not immoral is irrelevant. * * * p. 345

" * * * Defendant intended to engage in the leasing practices and pricing policies which maintained its market power. That is all the intent which the law requires when both the complaint and the judgment rest on a charge of 'monopolizing', not merely 'attempting to monopolize'. Defendant having willed the means, has willed the end. * * * p. 346

" * * * All that this opinion has ruled is that when control of the market has been obtained in large part by such leases, the market power cannot be said to have been thrust upon its holder through its own skill, energy, and initiative, or through technological conditions of production and distribution, or the inevitable characteristics of the market. * * *" p. 346

customers than if United were a seller, and "beyond this general quality" the four clauses which are "so drawn and applied" as to "exclude competitors" were the business policies with a deterrent effect; the business policies which erected "barriers" to competition and were traceable to the "lease-only system", and its "partnership aspects" and "exclusionary features". The court found that United intended to engage in leasing practices and pricing policies which maintained its market power and in so doing monopolized.

The conclusion is buttressed by the part of the opinion dealing with remedy. In discussing the remedies and their effects, the court clearly indicated that the lease-only system, restrictive clauses and related practices were the policies to be banned.[4]

The decree effectuated the court's intent as expressed in the opinion. After holding that United monopolized the shoe machinery trade and commerce among the several states, in violation of § 2 of the Sherman Act, the court enjoined United from using the lease-only system and purged the leases of the restrictive effects of the four clauses.

If the lease-only system was not a monopolistic practice by the aid of which United maintained its monopolistic position, it would have been unnecessary for the court to order its cessation since it is a practice which could exist independent of the other lease provisions and practices. The complaint in the Government case, the court's summarization of the charges in the complaint, the findings and opinions, and the decree show that the charges which were dismissed with prejudice related to certain charges of monopolizing and attempting to monopolize in certain areas other than shoe machinery.

United advances several reasons why the four "Form A" clauses had no effect on Hanover.

4. "From the opinion on defendant's violations it follows that some form of relief regarding defendant's leases and leasing practices is proper and necessary. p. 348
" * * * the Court agrees with the Government that the leases should be purged of their restrictive features. In the decree filed herewith, the term of the lease is shortened, the full capacity clause is eliminated, the discriminatory commutative charges are removed, and United is required to segregate its charges for machines from its charges for repair service. * * * p. 349
"The Court also agrees with the Government that if United chooses to continue to lease any machine type, it must offer that type of machine also for sale. The principal merit of this proposal does not lie in its primary impact, that is, in its effect in widening the choices open to owners of shoe factories. For present purposes it may be assumed that the antitrust laws are not designed, chiefly, if at all, to give a customer choice as to the selling methods by which his supplier offers that supplier's own products. The merit of the Government's proposal is in its secondary impact. Insofar as United's machines are sold rather than leased, they will ultimately, in many cases, reach a second-hand market. From that market, United will face a type of substitute competition which will gradually weaken the prohibited market power which it now exercises. Moreover, from that market, or from United itself, a competitor of United can acquire a United machine in order to study it, to copy its unpatented features, and to experiment with improvements in, or alterations of, the machine. Thus, in another and more direct way, United's market power will be diminished. p. 349
"Furthermore, the creation of a sales market together with the purging of the restrictive features of the leases will, in combination, gradually diminish the magnetic hold now exercised by what United properly describes as the partnership features of the leasing system. As United's relationships with its customers grow feebler, competitors will have an enhanced opportunity to market their wares. p. 350
" * * * It has used its leases to monopolize the shoe machinery market. And if leasing continues without an alternative sales system, United will still be able to monopolize that market. To root out monopolization and to bring United, in the future, in the same class as its competitors, it is necessary not merely to place limitations upon United's leases, but also to require United to offer for sale any machine type which it leases. * * * " p. 350

Full Capacity. One argument is that Judge Wyzanski held this clause to be a "deterrent" to competition on the basis of certain testimony [5] by United's president in which the witness merely adopted that word as used by the court, and to which the court gave unwarranted weight. United offered previous testimony by the same witness in the Government case to show that the witness may have thought that the court was using "deterrent" as applicable to past general practice, particularly since the testimony in the instant case shows that the full capacity clause was never enforced since the early 1940's.

Judge Wyzanski, after reviewing instances when the full capacity clause was invoked, found that this clause and other clauses were invoked in accepting returns of machines before the lease terminated, or in billing lessees for machine use, if the lessee desired to use a non-United machine in place of the United machine, whereas these clauses were not invoked if the lessee had some other reason for returning a United machine or for non-use of the United machine. Judge Wyzanski concluded that this "discrimination is designed to operate, and does operate as, a method of excluding from the shoe factories shoe machinery competitive with United." Having so concluded, the court added: "If this were otherwise doubtful, this finding is confirmed by the statement in court of United's president 'that the full capacity clause operates as a deterrent to a factory taking on a competitor's machine.' " Thus, the court reached its conclusion after a review of evidence other than the president's testimony.

Moreover, United's president was advised by counsel that his answers were to apply to the past as well as the present: "And if I ask you questions in the present tense, I also mean them to apply to the general practice in the past tense as long as you have been familiar with the matter, Mr. Brown."

United also argues that the president's adoption of "deterrent" is negatived by a previous question and his answer: "Has it ever been the practice of your company to invoke this full capacity clause to deter or prevent any of your lessees from replacing a machine which you have leased to him with a competitive machine. A. Never." United's president was then asked to explain why the "clause does not have that operation." He answered that a lessee may at any time install a non-United machine if the lessee uses the United machine to full capacity. This explanation is no more than a description of the lessee's rights under the lease. Sanctions under the full capacity clause could not be imposed, no matter what machinery was being used, if the United machine was being used to full capacity. Thus, any adoption of "deterrent" was not negatived by previous testimony.

United points to the testimony of Messrs. Sheppard of Hanover, Mills of

5. "The Court: If I have understood your answer correctly, you said that the full capacity clause operates as a deterrent to a factory taking on a competitor's machine, and it is a deterrent which the factory owner is not always aware of when he signs the lease. Have I misinterpreted your answer?

"The Witness: No, I think that is quite true. Very often they are not fully aware of the full capacity clause, or the way in which the obligation would devolve upon them.

"Q. Well, what I want to make clear is that even in the case where you have done that, have you told him that he couldn't return your machine. A. No, sir. On the contrary, we have gone to great lengths in most instances, and our branches I believe do so in all cases, because he has three alternatives, of course. He may return the machine if he wishes to, upon the basis I have outlined previously. If he wants to retain the machine, then we expect him to live up to the full capacity obligation in the lease, that is, that he will use the machine to full capacity.

"Q. And that is when he has work for it to do? A. That is right. Or if he wishes to use the other machine and not use ours, we expect that payment will still be made to us, of course, under the full capacity clause." (United's Exhibit 107)

Endicott Johnson Corporation, Erb of Melville Shoe Company, and Jones of Commonwealth Shoe Company that the full capacity clause was never enforced against these companies, and in the case of Mr. Erb, that the existence of the clause did not prevent his company from installing a competitive machine. The relevance of this testimony, for the most part, is not apparent. Judge Wyzanski found that the full capacity clause was not considered by United to have been violated unless the lessee failed to use the machine on work for which the machine was capable of being used, and instead performed such work by using a competitor's machine. Judge Wyzanski said: "In other words, it is not treated as a violation if the lessee fails to use United's machines because he performs the work by hand, or because he discontinues the type of operation for which the machine is capable of being used." The evidence of non-enforcement and that in certain instances shoe manufacturers were not prevented from installing non-United machines would be meaningful if there was also evidence that use of a competitor's machine caused the United machine to be operated at less than full capacity. There was no such evidence.

Finally, United argues that the uncontroverted testimony is that the full capacity clause has not been enforced since the early 1940's. This testimony was given by one of United's employees, who stated that since 1942 no attempt was made to enforce the clause because of the administrative difficulties involved. It is not clear as to whether this was intended to be a "company wide" or "location" abandonment of enforcement of the clause. But assuming it was a company wide policy, the full capacity clause was not deleted from the leases, and the company's intention to abandon enforcement

was not otherwise communicated to the lessees. In the absence of such communication, the lessee would expect enforcement of the clause.

Return Charge. United relies on testimony by Messrs. Sheppard, Erb, Jones and Mills that the return charge in no way prevented them from returning a United machine, either for replacement by a competitive machine or for any other reason. Mr. Sheppard's testimony dealt with the return of United machines because they were surplus, or in exchange for other or new United machines, and was not concerned with the return of United machines to be replaced by non-United machines. The other three witnesses testified the return charge did not prevent the return of United machines for replacement by non-United machines because they had accumulated substantial credit under United's "Right of Deduction Fund",[6] which would offset machine return charges. This testimony does not overcome Judge Wyzanski's finding that this clause was a deterrent or monopolizing practice. Judge Wyzanski found that the right of deduction fund was an informal policy which United had not expressly committed itself to continue, and that discriminatorily higher charges were assessed if a machine was returned, before the end of the term, to be replaced by a non-United machine, as compared with the lower charges assessed if the machine were returned for another reason. It should be noted also that Judge Wyzanski ordered United to discontinue the right of deduction fund and not substitute anything similar in any plan or lease.

Non-Segregated Repair Service Charges. The lease provided that the lessee was to make all repairs at its expense. Instead, United made the repairs at no additional cost. United argues that while

6. The Right of Deduction Fund is a plan, not part of the leases, but established by United in written notices to lessees, whereby (since 1939) 4 percent of all unit charges, rentals, and minimum charges on a machine is credited to the lessee. The credit is solely for the purpose of being applied, if the lessee desires, to deferred (or return) payments, and (since 1939) to payments for use less than minimum, due on that machine or other machines in that factory. The credit is not available if the lessee is in default on any payment due United, or if the lease has been terminated by reason of the lessee's breach or insolvency.

Judge Wyzanski found this practice tended to prevent the entry and existence of large-scale independent repair companies and hence put a stumbling block in the way of competing machinery manufacturers, it was a boon for the lessees. United states that Hanover realized it was getting repair service without additional expense, and insisted on efficient service at all times. Judge Wyzanski found United's practice of rendering repair service without separate charge "has brought about a situation" in which there are almost no large-scale independent repair companies. It was not a boon because Hanover paid for it. Judge Wyzanski found that United set monthly and unit charges high enough to pay for the services rendered. Judge Wyzanski pointed out this practice was an advantage to some shoe manufacturers, not because United performed the service when it was not obligated to do so, but because the manner of recovering costs therefor, through inclusion of a factor in machine rentals, worked to the advantage of those manufacturers that had high service requirements to the disadvantage of those that had low service requirements. The repair service clause plus United's conduct was a deterrent. Hanover paid for the service. To have non-United service meant double payment. Thus, independent service companies did not develop and Hanover was at the mercy of United.

Ten Year Term. United argues that by 1939 its machines had been under lease for more than 27 years, and those prior to 1929 were all on 5 year renewal terms; that the only exception after 1939 would be for new machines installed after that date. The answer is there were a substantial number either on 10 year terms for new machines, or on terms in excess of 5 years for those whose original term had not expired.

Neither the individual clauses nor the lease-only system can be viewed separately. The evil is the result of their collective use. As Judge Wyzanski said, " * * some of them alone are important impediments [but] they must be appraised collectively to appreciate the full deterrent effect." Judge Wyzanski found that if shoe machinery were available upon a sale basis, some shoe manufacturers would have been able to provide service at less cost than that charged by United. They would not be subject to the unilateral decision of United whether or not to continue or modify the informal policies by which it administered its leases, thereby releasing shoe manufacturers from some of the phychological and economic power United exercised over them.

In Futuro Argument. United submits that the decree in the Government case was intended to operate prospectively only, citing "may" in listing the effects of the full capacity clause. Judge Wyzanski did not use "may" in describing the effects on the other clauses. He characterized the four clauses as features which "have" a special deterrent effect, and spoke of the deterrent effects of United's policies on the shoe machinery industry.[7] It is clear that he had in mind the effects that the clauses and practices did have, and not merely the effects they might have. This is confirmed by the conclusion that United's practices operated as a method of excluding competitive shoe machinery from the shoe factories, based on findings of such practices in the 90 instances United invoked the full capacity, return, or like provisions of the standard lease during 1927–1948.

In its brief United states, "We are relying upon a unique record of res judicata and upon the fact that, as Judge Wyzanski acknowledged, the practices now attacked were in prior cases not only 'uncondemned' but also 'were in part endorsed'." [8] It maintains that its preponderant position, as measured by percentages of machines in shoe factories, is not

7. See footnote 3, supra.

8. Three earlier antitrust cases involved United: United States v. Winslow, 1913, 227 U.S. 202, 33 S.Ct. 253, 57 L.Ed. 481; United States v. United Shoe Machinery Company of New Jersey, 1918, 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968; and United Shoe Machinery Corp. v. United States, 1922, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708.

enough to sustain Hanover's burden of proof of monopoly; that this position is due to its original constitution, which Judge Wyzanski regarded as protected by res judicata, and the superiority of its products; that Judge Wyzanski found the leasing system honestly industrial; and that even the full capacity clause had been approved in a prior case.

The prior Government cases do not bar the holding of monopolization. Judge Wyzanski was aware of them when he framed his findings, opinion and decree. He indicated that but for the prior cases he would have held United in violation of Section 1, as well as Section 2 of the Sherman Act. There is no support for the statement that United's preponderant position is due to its original constitution and product superiority. Judge Wyzanski pointed to these two factors and the leasing system and its aspects as the principal sources of United's power. In connection with product development, which is closely related to product superiority, Judge Wyzanski found that the rate at which United improved old machine types did not create a formidable record, and United's research in the shoe machinery and in allied developments was neither the basic cause of its success nor far beyond what could be achieved in a monopoly free market. The leasing system and its aspects were the barriers to competition, and were the basis for the decree of monopolization. It is immaterial that Judge Wyzanski said the original consituation was protected by res judicata, and that he did not criticize the other sources of United's power. And while he did say that the leasing system and practices were honestly industrial, he also said that they represent policies which are unnatural barriers to competition, unnecessarily excluding actual and potential competition and restricting a free market.

There is also the contention that Judge Wyzanski's judgment gave effect to what he recognized to be a change in the law beginning with United States v. Aluminum Co. of America, 2 Cir. 1945, 148 F.2d 416; that while courts can overrule their own decisions and change the law retroactively, they also can limit a precedent reversing decision to prospective application; and that retroactive application of an overruling decision is inequitable and is not invoked when persons have acted in reliance on the prior decision. Assuming that the decision in the Aluminum Co. case represented a change in the law, effective in 1945, Judge Wyzanski did not attempt to limit his decree to the future. Therefore, there is no merit to this argument. See American Amusement Co. v. Ludwig, D. Minn.1949, 82 F.Supp. 265, 267; United States v. Calamaro, E.D.Pa.1956, 137 F. Supp. 816, 820, rev'd on other grounds, 3 Cir. 1956, 236 F.2d 182, aff'd 1957, 354 U.S. 351, 77 S.Ct. 1138, 1 L.Ed.2d 1394. Some of the relief looks to the future, but this does not mean that the court did not find a monopolization, or did not intend its decree to be retroactive. The decree operated both ways. The court required United to cease certain practices and also to terminate outstanding leases.

In summary, the findings, conclusions and decree in the Government case established that United's preponderant position coupled with its lease-only system, the four clauses and its practices with respect thereto constituted a violation of Section 2 of the Sherman Act, and that such policies and practices were restrictive or monopolistic during the complaint period in this action, and had a restrictive effect on Hanover and other shoe manufacturers. With the aid of the decree Hanover has proved a monopolization.

2. The Estoppel Aspects and Relevance of the Government Decree.

█ The estoppel aspects and relevance of the Government decree have been termed by some courts the "target area." These courts have held that if the decree, fairly construed, does not embrace the plaintiff as a target of the antitrust violation, there can be no recovery. The injury and the damage must not be remote from the violation. A plaintiff "must show that his claimed

injury stemmed directly and proximately from the same type of practice condemned in the prior Government action." International Shoe Machine Corp. v. United Shoe Machinery Corp., 1 Cir. 1963, 315 F.2d 449, cert. denied 1963, 375 U.S. 820, 84 S.Ct. 56, 11 L.Ed.2d 54. The difficulty does not lie in the principle, but in its application. "It is not possible to formulate any general rule by which to determine what injuries are too remote to bring a plaintiff within the scope of the Act * * *. Each case must be dealt with on its own facts." Harrison v. Paramount Pictures, Inc., E.D.Pa. 1953, 115 F.Supp. 312, aff'd per curiam, 3 Cir. 1954, 211 F.2d 405.

Prior to the trial, there was a trial on a separate issue in accordance with Fed.R.Civ.P. 42(b), 28 U.S.C.A. The issue was to determine whether excessive shoe machinery costs constituted an injury in that all such costs were passed on by Hanover to its customers. The late Judge Goodrich of the Court of Appeals, sitting as a district judge, found for Hanover. Hanover Shoe, Inc. v. United Shoe Machinery Corp., M.D.Pa. 1960, 185 F.Supp. 826. The Court of Appeals affirmed, 3 Cir., 281 F.2d 481. The order for the separate trial assumed that (1) the violation of law as alleged existed, and (2) the excessive cost of shoe machinery as alleged existed. Judge Goodrich held that "The causal relation between defendant's wrong and plaintiff's harm is obvious."

In La Chapelle v. United Shoe Machinery Corp., D.Mass.1950, 90 F. Supp. 721, the complaint charged that an inventor was forced to sell his product to United at less than its value because of United's monopoly. The court refused to dismiss the complaint.

> "The more frequent complaint against a monopoly is by one who seeks to buy and complains that since the monopolist controls the market he must therefore buy from the monopolistic seller at the latter's price, or not at all. But the injury is equally great to one who wishes to sell his product in a market sub-ject to monopolistic control and must sell to the monopolist as the only available buyer, again on the monopolist's terms, or not at all. Here the injury is the direct result of the monopolistic condition which has been created, and the injured seller may recover under § 15." (90 F. Supp. at p. 723)

After an answer was filed, the court granted defendant's motion for summary judgment because the plaintiff had previously filed a complaint against the defendant alleging the same cause of action, which had been dismissed with prejudice. The reason for the dismissal does not appear. No appeal was prosecuted. Consequently, La Chapelle is still authority for the proposition that the target area is not limited to a monopolist's competitors. See Congress Building Corp. v. Loew's, Inc., 7 Cir. 1957, 246 F.2d 587; Vines v. General Outdoor Advertising Co., 2 Cir. 1948, 171 F.2d 487.

In Chattanooga Foundry & Pipe Works v. City of Atlanta, 1906, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241, plaintiff purchased pipe at an excessive price due to an illegal arrangement between defendant and others. The court held the plaintiff " * * * was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe." United attempts to distinguish this case because the excessive price of the pipe represented property diminished by the payment of money wrongfully induced by a conspiracy; whereas, here there is no wrongful inducement because the rentals were paid in accordance with valid leases. In Chattanooga the sale was lawful, but the motives and inducements to make it constituted a wrong, that is, a combination of members of a trust who arranged for the sale at an excessive price after simulated competition which induced the buyer to buy. The court said:

> " * * * Finally, the fact that the sale was not so connected in its terms with the unlawful combination as to be unlawful (Connolly v.

Union Sewer Pipe Co., 184 U.S. 540 [22 S.Ct. 431, 46 L.Ed. 679] ), in no way contradicts the proposition that the motives and inducements to make it were so affected by the combination as to constitute a wrong. * * * "

United confuses the validity of the leases with the motives and inducements behind them. Hanover was induced to enter into the leases by the absence of suppliers brought about by the monopolistic practices, including the lease-only policy. The motives and inducements were so intertwined with the monopolization practices as to constitute a wrong. Both Atlanta and Hanover were buyers from an antitrust violator. The damages sought in both cases are the higher business costs caused by the wrongdoers. The cases cannot be distinguished.

The cases relied on by United are distinguishable. In Eagle Lion Studios, Inc. v. Loew's, Inc., 2 Cir. 1957, 248 F.2d 438, aff'd by an equally divided court, 1958, 358 U.S. 100, 79 S.Ct. 218, 3 L.Ed. 2d 147, the court interpreted the decree in the Government case as deciding that defendants monopolized only with respect to a segment of the market. They had restricted the films of the major distributors, but not those of the plaintiff and other independent producers. The practices of United were directed at the shoe machinery trade and commerce, and, therefore, at Hanover, a substantial and captive customer. In Conference of Studio Unions v. Loew's, Inc., 9 Cir. 1951, 193 F.2d 51, cert. denied, 1952, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687, the court held that the injury to plaintiffs, a union and its members, did not flow from the injury to the competitive situation of the motion picture industry caused by the restriction of activities of independent producers by defendants, a rival union and major film producers. The plaintiffs were not in the business of making or exhibiting motion pictures, did not compete with defendants, did not buy from them, and were not even employees of the companies which the defendants intended to destroy. The remoteness of plaintiff's injury was apparent. In Karseal Corp. v. Richfield Oil Corp., 9 Cir. 1955, 221 F.2d 358, Karseal and Richfield were manufacturers of wax. Richfield applied restraints to capture the independent gas station market. The court held Karseal was in the target area. The fact that Karseal marketed its product through middlemen, while Richfield dealt directly with retailers, was immaterial. The fact pattern for a direct injury was strong in Karseal. The court said: "Assuming Karseal was 'hit' by the effect of the Richfield antitrust violations, was Karseal 'aimed at' with enough precision to entitle it to maintain a treble damage suit * * * ?" Since Karseal was directly in Richfield's aim, the case sheds little light on the standard by which "enough precision" can be measured.

While Eagle Lion Studios, Conference of Studio Unions and Karseal are distinguishable on the facts, under the target area tests suggested by these cases Hanover's injury flows proximately from the monopolization. The complaint in the Government case listed the effects of the monopolistic practices on the shoe manufacturers, as well as on United's competitors. One of the effects on the lessees was United's extraction of large sums of money in excess of the reasonable value of machinery and of the service rendered by United. A similar charge is included in Hanover's complaint. Judge Wyzanski found that United's policies have " * * * not necessarily promoted in the *shoe manufacturing* field the goals of a competitive economy and an open society." He pointed out that if United shoe machinery were available on a sale basis, United's psychological and economic control over shoe manufacturers would be released, which in turn would cause some shoe manufacturers, for financial and psychological reasons, to be more willing to dispose of United's machines and take on either competitors' machines or United machinery available in a secondhand market. It is obvious that the financial considerations were that some manufac-

turers would find it less costly to own than to lease machinery. Thus, a charge and finding of detriment to a particular class of persons, as seemingly required by Eagle Lion Studios, is present.

The facts satisfy the test of the Conference of Studio Unions case. Shoe machinery is not absorbed by the general public; it is meant for use solely by shoe manufacturers. They consume all of it, and its cost is a factor in the pricing of shoes. Shoe manufacturers are directly interested in the development of better machinery, and in the quality of existing machinery. It is clear that a shoe manufacturer is " * * * within that area of the economy which is endangered by a breakdown of competitive conditions * * * " in the shoe machinery industry.

The stifling of the business of competing shoe machinery manufacturers was a direct object of United's actions, but it was not the only object. It permitted United to deal with shoe manufacturers on United's terms, and the terms in turn permitted United to stifle the competition. The monopolistic terms, such as the lease-only system and the related clauses and practices, caused both the injury claimed by Hanover and the injury to United's competitors. There is nothing strange about an actor having more than one immediate object of his acts. The aim was wide enough to accomplish both. Hanover was "aimed" at and "hit," the test of Karseal.

United accuses Hanover of an attempt to bring itself within the target area " * * * by saying it was obliged to 'obtain its machinery from defendant at a cost in excess of what it would have to pay absent the monopolization' (Pl. br. 9). It tries to use its claim of excessive price to show injury as a result of antitrust violation. So far as the decree is concerned, it is enough here to point out that that claim was dismissed by Judge Wyzanski. Decree par. 2 dismisses with prejudice all other charges of violation than those there enumerated. Among those charges was the charge of excessiveness contained in par. 97 of the Government complaint as follows:".

This argument confuses Hanover's primary and alternate damage claims. Excessiveness relates principally to the alternate damage flowing from the difference between the rent and royalty charges United exacted from lessees when faced with competition and the higher charges exacted when it was not so faced. Hanover's primary claim is measured by the difference between the higher cost of leasing machines and the cost of owning them. The primary claim does not necessarily imply excessive returns to United.

The complaint in the Government case included an allegation that United collected excessive, arbitrary and noncompetitive charges for its products and services and thereby made excessive and unreasonable profits. Judge Wyzanski noted that while United generally followed a policy of setting prices so its shoe machinery business returned income to cover costs plus a profit, there were instances in which the rates were adjusted to meet or defeat competition, and to retain and expand United's share of the market. He found no evidence that United secured a monopoly profit on its entire or machinery branch operations. He did not make a finding that profits were excessive or unreasonable. While he found that the discriminatory pricing policy was evidence of United's monopoly power, a buttress to it and a cause of its perpetuation, he stated his decree would not deal with the price discrimination aspects of United's policy because some not too rigid price discrimination is inevitable, some is justified as resting on patent monopolies, some is desirable in promoting a competitive market, and an order to eradicate such discrimination could not be enforced.

▬ The doctrine of collateral estoppel by judgment extends only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.

Partmar Corp. v. Paramount Pictures Theatres Corp., 1954, 347 U.S. 89, 74 S.Ct. 414, 98 L.Ed. 532; Emich Motors Corp. v. General Motors Corp., 1951, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534. The findings and conclusions on the price discrimination aspects of the pricing policy cannot be considered matters upon the determination of which the finding or verdict was rendered in view of the specific language that the decree would not attempt to deal with these matters. Thus, there cannot be an estoppel.

Hanover also relies for its alternate damage on certain documents in evidence in this case. One is a summary of 19 instances in which United reduced rents and royalties on certain machines because of competition. These 19 instances were taken from more than 50 instances in evidence before Judge Wyzanski, and from which he drew 9 for detail analysis in arriving at his findings. Hanover asks this court to infer from the summary and from the evidence of overwhelming market control that, if competition existed, Hanover would have had the benefit of reductions similar to those listed on the summary. Admittedly, few, if any, of the machines on this summary were used by Hanover, and most of the reductions took place prior to the complaint period in this case. The summary is irrelevant. The inference urged by Hanover cannot be drawn. International Shoe Machine Corp. v. United Shoe Machinery Corp., 315 F.2d 449, supra. The decree created no estoppel with respect to the findings based on the evidence of 50 instances of reduced rentals, so that the only evidence before this court is the summary of the 19 instances.

Hanover also introduced in evidence a schedule of the percentage of revenues to machine or bulletin costs. The machine or bulletin cost is not the only item considered before a machine rental is set. The development expenses, installation costs, 10 year service costs, and interest on the last two items, are also considered. The rental would include all these plus a profit, so that the percentage derived from the comparison does not demonstrate a "high rate of return." Moreover, while Hanover points to high percentages it considers "startling," the schedule contains percentages which are extremely low. The schedule also invites other comparisons such as the comparison of revenues with Hanover's computed sales price, also on the schedule, which would reduce the percentages considerably. There is no evidence of the normal rate of return if the omitted cost factors were included. In short, the schedule and related evidence are not sufficiently probative of the alleged high rates of return to United.

Hanover has failed to prove its alternate damage claim. This does not affect its primary claim measured by the difference between the cost to operate its business with lease-only machinery and the cost to own the machinery. The rental returns may not have been excessive, but there is a difference between non-excessive returns and machinery costs in excess of those which would have been incurred had the machinery been purchasable. As stated by Judge Wyzanski, "Some truth lurks in the cynical remark that not high profits but a quiet life is the chief reward of monopoly power." Machine rentals which return costs plus a reasonable profit to United may be substantially in excess of the machine costs to a shoe manufacturer dealing in an unrestricted market. A supplier's costs may be inflated due to inefficiency, excess personnel, or other reasons. Such conditions might not exist in a competitive market. There is no necessary inconsistency between a reasonable rate of return and proof that the rentals were substantially in excess of the cost of ownership. If the "quiet life" brought about by the monopolistic practice of United's lease-only system produced some excess costs to Hanover, it need not rely on excess returns to United to show damage. Hanover's claimed primary injury is injury flowing from United's lease-only policy and practices, provided Hanover was at all times ready, willing and able to buy machinery.

Judge Wyzanski did find there was virtually no expressed dissatisfaction from consumers respecting the leasing system, and that all shoe manufacturers who testified on the point expressed a preference for the leasing system. This was not a finding that shoe manufacturers were not hurt by the leasing system. Judge Wyzanski pointed out that "It cannot be said whether this absence of expressed dissatisfaction is due to lack of actual dissatisfaction, to practical men's preference for what they regard as a fair system, even if it should be monopolistic, or to fear, inertia, or reluctance to testify." He then pointed out the system's adverse effects on the goals of a competitive economy and on open society as related to the shoe manufacturing field.

3. Choice of Marketing Methods.

 United urges that the language of Judge Wyzanski negates a duty to sell:

> " 'The Court also agrees with the Government that if United chooses to continue to lease any machine type, it must offer that type of machine also for sale. The principal merit of this proposal does not lie in its primary impact, that is, in its effect in widening the choices open to owners of shoe factories. *For present purposes it may be assumed that the anti-trust laws are not designed, chiefly, if at all, to give a customer choice as to the selling methods by which his supplier offers that supplier's own products.* The merit of the Government's proposal is in its secondary impact [i. e. creation of a secondhand market]. (Emphasis supplied)' " [9] 110 F. Supp., at 349, 350.

Judge Wyzanski found that the lease-only system and lease clauses enabled United to monopolize the shoe machinery market, and to end this monopoly it would be necessary not only to place limitations on United's leases, but also to require United to offer the machines for sale. Thus, United had a duty to refrain from illegal trade practices. See Congress Building Corp. v. Loew's, Inc., 246 F.2d 587, 594, 596, 597, supra. If one of the practices by which it monopolized the market was its lease-only policy, it had a duty to abandon that policy. The only effective way was by an alternative sales system. The antitrust laws were designed to prevent monopolistic practices. They are not to be thwarted because an incidental effect of the decree may give a customer a choice of the supplier's marketing methods. While ordinarily a supplier may determine his own business practices, they will be condemned as illegal if they are used to achieve a monopoly. "A refusal to sell, while it may be lawful per se, cannot be used in order to achieve an illegal result." United States v. Klearflax Linen Looms, Inc., D.Minn.1945, 63 F. Supp. 32, 39. It is only another step to say a refusal to sell coupled with a willingness to lease may be lawful, but Judge Wyzanski found these achieved an illegal result:

> "It has used its leases to monopolize the shoe machinery market. And if leasing continues without an alternative sales system, United will still be able to monopolize that market. To root out monopolization and to bring United, in the future, in the same class as its competitors, it is necessary not merely to place limitations upon United's leases, but also to require United to offer for sale any machine type which it leases." 110 F.Supp., at 350.

4. The Legality of the Leases.

United relies on the legality of the leases as a complete defense. It cites Bruce's Juices, Inc. v. American Can Co., 1947, 330 U.S. 743, 755, 67 S.Ct. 1015, 91 L.Ed. 1219; Kelly v. Kosuga, 1959, 358 U.S. 516, 518, 520, 79 S.Ct. 429, 3 L.Ed.2d 475; Turner Glass Corp. v. Hartford-Empire Co., 7 Cir. 1949, 173

---

**9.** Quotation as it appears in United's brief at page 24. The original opinion did not contain the material in brackets or the emphasis.

F.2d 49, 52, for the proposition that since the Form A leases are enforceable as contracts the courts will not sanction a belated antitrust action to avoid legal obligations now completely performed.

Whether the leases are legal is not important in this lawsuit because Hanover is not suing on them. United apparently contends that it would be unjust for Hanover to recover monies which would in effect offset rentals and royalties paid under a valid contract. It would also be unjust to allow a monopolist to escape liability for injury and damage inflicted on another even though the contractual dealings between them were legal. United's products and services may have been efficient, the prices not excessive, and the leases lawful, but it runs the risk that its monopolistic acts may cause actionable injury. In Chattanoogo Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, at page 397, 27 S.Ct. 65, at page 66, 51 L.Ed. 541, supra, the court said:

"* * * In most cases where the result complained of as springing from a tort is a contract, the contract is lawful, and the tort goes only to the motives which led to its being made, as when it is induced by duress or fraud."

The cases cited by United do not support its theory. In Turner Glass Corp. v. Hartford-Empire Co., supra, plaintiff offered no evidence to prove a pecuniary damage by reason of defendant's membership in a conspiracy to monopolize, but contended that the payment of license fees to defendant was evidence of pecuniary damage. Plaintiff admitted that if the license agreements were not inherently illegal, it could not prevail. The court held for defendant because they were not inherently illegal.

Similarly, in Bruce's Juices, Inc. v. American Can Co., supra, in an action for the purchase price of goods, the court refused to allow the defense of illegality of prices, but told the defendant it could prove the illegality in the triple damage action, which was pending.

"* * * Moreover, if Bruce can in this suit prove that the prices respondent charged were illegal, as it must in order to win, it can do the same in a triple damage suit. * *" Page 752 of 330 U.S., 67 S.Ct. at page 1019.

The court simply refused to add another sanction to the antitrust laws.

"The Act prescribes sanctions, and it does not make uncollectibility of the purchase price one of them. Violation of the Act is made criminal and upon conviction a violator may be fined or imprisoned. 49 Stat. 1528, 15 U.S.C. § 13a. Any person who is injured in his business or property by reason of anything forbidden therein may sue and recover threefold the damages by him sustained and the costs of suit, including a reasonable attorney's fee. 38 Stat. 731, 15 U.S.C. § 15. This triple damage provision to redress private injury and the criminal proceedings to vindicate the public interest are the only sanctions provided by Congress.

"It is contended that we should act judicially to add a sanction not provided by Congress by declaring the purchase price of goods uncollectible where the vendor has violated the Act. * * *" Page 750, 67 S.Ct. page 1018.

Then, after suggesting that the argument for the additional sanction might be a persuasive one for Congress, the court said:

"* * * It is clear Congress intended to use private self-interest as a means of enforcement and to arm injured persons with private means to retribution when it gave to any injured party a private cause of action in which his damages are to be made good threefold, with costs of suit and reasonable attorney's fee." Page 751, 67 S.Ct. page ——.

In Kelly v. Kosuga, supra, it is clear that the court decided that the avoidance of private contracts is not to be added to the sanctions provided by the Sherman Act. Implicit in these cases is that the sanctions of the Sherman Act remain undisturbed. A legal and enforceable contract does not insulate a monopolist from liability to contracting parties.

D. The Injury.

1. Demonstration of Injury.

Hanover relies on Judge Goodrich's opinion in the separate trial of the "passing on" issue to prove injury. United answers that this is erroneous because Judge Goodrich went beyond the two assumptions on which the issue was tried, and made the causal connection himself in order to decide the issue.[10]

Judge Goodrich clearly ruled that on the basis of the assumptions Hanover suffered actual injury. He did not supply assumptions. His ruling shows that if the stipulated assumptions are proved, the other elements, the injury and the causal connection, are present as a matter of law. United misconstrues Judge Goodrich's statement " * * * If there are affirmative defenses or other complicating legal issues, they are not before the Court at this time." The fact of injury is not an affirmative defense, but an essential element of the cause of action, and the "other" issues refer to issues of which he was not aware. He was aware of the need to establish injury.

The hypothesis in the proceeding before Judge Goodrich was broad enough to cover Hanover's primary claim of damages. Judge Goodrich analogized this tort to negligence: " * * * there is (1) a legal duty on defendant's part (to obey the antitrust laws), (2) a violation of that duty, * * *." Similarly, there is a right in Hanover to conduct its business in a market free from the restraints of a monopolist. United's monopolistic practices violated that right. United's violation of that right caused an injury. If Hanover proves the amount of damage, as Judge Goodrich stated, the causal relation between United's wrong and Hanover's harm is obvious. This court fully agrees with Judge Goodrich, and finds that Hanover sustained redressable injury by United's acts. Thus, while United's characterization of the trial of the "passing on" issue as a "mere motion to dismiss" makes no difference with respect to whether this court can and should follow such decision as the law of the case. 1A Moore, Federal Practice, Para. 0.404(4) at page 4213, Para. 0.404(10) (2d ed.); United States v. Wheeler, 3 Cir. 1958, 256 F.2d 745, 747, in view of this court's finding, United's argument with respect to the law of the case need not be fully discussed.

2. The Impact of Monopolization on Hanover.

As a final and complete defense to the antitrust violation United contends Hanover has not shown actual impact of monopolization on it. Some of the reasons advanced are: There was no written purchase policy or expression by the Board of Directors; Hanover bought machines only when it was advantageous to do so; Hanover leased 136 optional machines; Hanover never protested its inability to purchase lease-only machines; the 1955–1956 purchases disprove a purchase policy because important machines were retained on lease, some were replaced by non-United machines, 39 were returned, and in buying Hanover used its credits in the Right of Deduction Fund as part of the purchase price; both foreign and non-United domestic machines were available; Hanover's attitude toward United's leasing policy is the result of a quarrel between its president and certain United officials; Hanover and its competitors enjoyed equality of treatment since the lease terms were uniform, and, thus, there could not be an injury; and Judge Wyzanski found virtually no shoe manu-

10. The two assumptions were (1) that the violation of the law as alleged existed, and (2) that the excessive cost of shoe machinery as alleged existed.

facturer was dissatisfied with the leasing system.

There was testimony that since the 1920's Hanover was actively engaged in a search to buy non-United Goodyear welt shoe machinery. Mr. Sheppard, president of Hanover, described clicking machines which were purchased to replace United's machines. He told of visits in the 1920's and 1930's to various other welt shoe factories in a search for machines. In the early 1940's Hanover purchased some sole leather dieing out machines to replace their United counterpart. The search for machines was dormant shortly before and during World War II. Whenever shoe makers gathered, there was talk about the purchase of foreign machines after the war ended. Hanover and other shoe factories tested many foreign machines when they became available in 1948 and 1949. The various shoe manufacturers exchanged the test information. The tests and other evidence showed that between 1939 and 1955 only a few non-United machine types, comparable to United lease-only machines, could be used satisfactorily in the Goodyear welt process. Only three such machine types were found and in each case Hanover purchased them.

In 1949 the National Shoe Manufacturers Association (N.S.M.A.), of which Mr. Sheppard was president from 1946 through 1949, and representing 85 to 95 percent of the shoe manufacturing industry, formed a committee, with Mr. Sheppard as a member, to study numerous problems concerning shoe machinery costs, to search for and disseminate information on modern non-United shoe machinery, to assist members in the evaluation of machinery, and to persuade United to offer more of its machinery for sale.

The absence of a written declaration of a policy to buy machinery, the lack of such an expression in its minutes, and the testimony of Mr. Sheppard that Hanover's policy was to buy machinery only " * * * as far as we could do it advantageously and worth while" are not significant. Hanover was a closely held family corporation. The most important machines were not for sale. Mr. Ray Purtell, employed by Hanover as an assistant superintendent from 1949 to 1956, testified that during his employment the policy of Hanover was to purchase machines, both United and non-United. The policy to purchase only when it was advantageous is merely sound business practice. Hanover need not show that in any and all cases it would have purchased, but that it likely would have purchased the machines. Hanover's purchase of substantially all of United machinery in place at Hanover in 1955–1956 is some indication Hanover would have considered it advantageous to purchase during the lease-only period.

Hanover never asked United if it could buy the lease-only machines. Neither did it protest its inability to buy. Mr. Sheppard testified that any such request would have been a "foolish question." This explanation does not seem unreasonable in view of the findings in the Government case and the evidence in this case. Not only Mr. Sheppard, but representatives of the whole shoe machinery industry apparently thought that they were captive customers of United. In a proposed statement by the technical committee of the N.S.M.A. to United protesting increases in unit charge rates in 1950, the committee requested that it be consulted about rate increases particularly " * * * since the only choice a shoe manufacturer has is to pay the increases or stop making shoes."

Mr. Sheppard was interviewed by representatives of United prior to the Government case. The purpose of the interview was not to obtain Hanover's complaints against United, but to obtain Mr. Sheppard as a witness for United in the Government case. He was asked whether he had any objections to the leasing system, but he was not asked whether he would prefer to buy rather than lease. The leasing system had many facets of which lease-only was one. In view of the shoe machinery market, a reasonable interpretation of the question is whether

there was any objection to the leasing system as it existed. In the interview he mentioned an incident when he refused to lease clicking machines because United insisted that Hanover acknowledge in the lease that United owned the machine dies which Hanover had purchased. Before the matter could be resolved, Hanover purchased 11 Reece clicking machines. Mr. Sheppard described the rejection of the United machines as brazen and "perhaps stupid," because the Reece machines were unsatisfactory and later abandoned with a return to United machines. This one instance does not support an inference that Hanover would have purchased machines only when the lease terms were unacceptable.

Optional Machines. During the complaint period Hanover leased 136 optional machines. The optional machines were the minor, simpler, less complex machines. Some were not purchased because the price was too high. During the same period Hanover purchased non-United machinery, exclusive of dry thread sewing machines, for prices totalling about $335,000. This was almost four times the rentals of both United and non-United machinery it could have purchased during the same period. In addition, Hanover purchased United optional machinery totalling about $29,600. The rentals for non-United machinery totalled about $101,100, of which about $76,900 was for lease-only. Total rents and royalties paid United were about $2,417,700, but only about $64,700 or 2.68 percent was for optional machines.

The effect of optional machine rentals, which were flat rate, could be minimized through efficiency and quantity production, and this would offer less incentive for ownership than in the case of lease-only machines. The latter, with few exceptions, were offered only on a royalty or rental and royalty basis. The leasing of some optional machinery because the purchase price was too high, the substantial purchases of machinery from non-United sources, the low percentage of optional rentals to rental and royalty expense, and cost savings which could be achieved through efficient use of optional machines point to a Hanover purchasing policy, rather than to a leasing policy.

The 1955–1956 Purchases. Pursuant to order of the district court in the Government case, a plan for the termination of all outstanding Form A leases became effective on June 1, 1955. All lessees were given the option to terminate their leases, and to purchase the machines at prices computed in a discount schedule set out in the plan. In October, 1955, Hanover purchased 205 of the 306 machines it then held on Form A leases, deferring action on the remaining machines for various reasons. By December, 1956, Hanover had purchased an additional 7 machine types, consisting of 58 machines, and it returned 37 machines to United. The total cost of the machines purchased by Hanover in 1955 and 1956 was about $613,900. In 1960 two additional machines were purchased, three were returned and one remained on lease. Also, in 1955 when United offered its lessees the option to service their own machinery, with a credit of 13.3 percent against lease charges, Hanover chose to do so. These purchases show a disposition by Hanover to buy if it could do so advantageously. It is true that the prices were at discounts and the result of negotiations, and that Hanover postponed for one year a decision to buy about $100,000 worth of machinery. United says the prices were bargains; at the time the N.S.M.A. said they were too high. The 1955 prices were the product of extended discussions in which factors such as age, obsolescence, etc., were applied. Even if the prices were bargains, it does not follow that Hanover would not have bought at higher prices. There is no evidence that Hanover refused to buy unless prices were a bargain. Also, the evidence is that Hanover retained the $100,000 worth of machines on lease, not because it preferred leasing, but because certain newly developed United and non-United machines were about to be marketed which might make those machines obsolete. Most of these

were subsequently purchased. Hanover weighed many factors, such as price, the years required for a return of the investment, etc., before it decided to purchase. This was sound business judgment. Undoubtedly, these same factors would have been considered in 1939 and subsequent years. This does not justify an inference Hanover would not have bought during the complaint period. It authorized the purchase of machines of $500,000 from United and $250,000 from non-United sources. The few instances pressed by United to support a contrary inference are not convincing.

In its brief United states that Hanover did not buy important machine types such as heel seat lasters, toe lasters, and Goodyear stitchers, but retained them on lease. This was the testimony of Mr. Ray Purtell who had not been employed by Hanover since 1956, and who testified "to the best of my memory." The credible evidence shows, however, that Hanover purchased four heel seat lasters and 14 toe lasters in the first group of purchases in 1955, and that none remained on lease. Also, 17 Goodyear stitchers were included in the first group of purchases, and of the two retained on lease, one was only a spare or standby machine and the other was eventually replaced by a foreign machine.

United also states that after completion of the 1955–1956 purchases, Hanover continued three machines on Form A leases until their return in 1960. The testimony in support of this statement is somewhat ambiguous, and the record otherwise shows the machines were retained on the Form B lease.[11] One was a machine type of which Hanover purchased nine, indicating that this may have been an excess machine. Another was a machine type of which Hanover purchased two, and the evidence is that the returned machine was a new machine originally listed for purchase. The third was the spare or standby Goodyear

stitcher. Hanover also converted to Form B leases certain machinery considered for purchase in 1955. Except for the Goodyear stitcher, these machines were later either returned or purchased.

Hanover replaced certain United machines with non-United machines. These instances were few, but together with Hanover's contemplated expenditure of $250,000 on non-United machines and its action in waiting for the development of non-United machinery indicates that Hanover did not prefer to lease United machinery. Hanover's disposition to buy United machinery may be inferred from both non-United and United machinery purchases in 1955–1956, particularly if acceptable non-United machinery was not available prior to that time.

The return of 39 machines at the time of and following the 1955–1956 purchase demonstrates only the unlikelihood of the purchase of those machines, but not the other machines. They were only a small part of the machines evaluated for purchase. Some were optional which never entered into the damage calculation. Hanover eliminated rental costs from the remainder so that only relevant royalty costs remain in the damage calculation.

Availability of Domestic Non-United Machines. There is little evidence that major comparable non-United machines for use in the Goodyear welt process were available from United States manufacturers. Mr. Swinney, a retired employee of and consultant to Genesco, a shoe manufacturer, testified that in 1949 he had seen a Hamlin heel and toe bed laster in the Hamlin Shoe Co. in Massachusetts, and in 1920 he had seen a R. H. Long lockstitch machine in the Rice and Hutchins factory in Massachusetts. While these machines performed the same function as their United counterparts, he did not testify that their performance and capacity compared with United machines. He identified some 15–20 other domestic machines, whose

---

11. The Form B leases were the new leases approved as part of the plan to terminate Form A leases. The objectionable features of the Form A lease were eliminated.

functions were similar to certain United machines. He only mentioned two that were of comparable quality. One, the Prime Manufacturing Rib Reinforcing Machine, was purchased by him in 1949 when he bought three for a total of $125.00. It is not likely this was comparable because the 1955 price of one such United machine was $4,825.00. The other, a Peerless Machine Works Eyeletting Machine, was purchased by him in 1949, but there is no indication as to how long the machine had been available for purchase. Neither machine was one of the eight key machine types used in the Goodyear welt process: Pulling Over, Staple Side Lasting, Toe Lasting, Heel Seat Lasting, Inseaming or Welting, Inseam Trimming, Rough Rounding, and Lockstitching. Moreover, although Mr. Swinney had been associated with the shoe business for many years, most of his observations were limited to the years 1949–1950.

While Hanover purchased three Le-Matic Sole Press machines and ten Schwabe Clickers in 1951 and subsequent years, there is no evidence of how long these had been available prior to 1951. The only machine which appears to have been available prior to and since is the Landis stitcher which, while primarily intended for use by the shoe repairing industry, was also used satisfactory in welt shoe manufacture.

Availability of Foreign Machines. The principal testimony was given by Mr. Swinney and Mr. Major, also an employee of Genesco, Mr. Walker, an official of United, and Mr. Becka, general manager of the International Shoe Machinery Company. In 1950 both Mr. Swinney and Mr. Major were connected with the establishment in Israel of a shoe factory in which Genesco had an interest. The following is a summary of their testimony, together with comment.

Mr. Swinney. The Goodyear welt machines used in the Israeli factory had been obtained in England from Standard Engineering Company, a British manufacturer. They performed the same function as United machines. Most of his observations were limited to machinery he saw in operation in 1949 in connection with the procurement of machinery for the Israeli factory. He identified about 70 foreign machines of various types and manufacture which he had seen in operation. He did not testify that any of these machines were in operation in the United States between 1939–1955. There were seven machines of different types which he considered comparable to United machines. Six of these were Standard. There was no evidence that they were available before 1949–1950. Only two were in the key category. One was a Standard Oscillating Welt Wheeling Machine No. 93, "Very similar in quality and quantity of production" when compared with the United machine, called Goodyear Welt Indenting and Burnishing. The capacity of the Standard machine was 700–800 pairs of shoes per day, and two different United machines of that type had a capacity of 1800 pairs per day. The other was the Standard Heel Seat Lasting machine, on which he expressed no opinion on comparableness. According to the catalog, capacity of the comparable United machine exceeded the Standard by 300 to 400 pairs per day.

Although for a long time Genesco had much information on foreign machines, and had tried them, it used only United machines in its Goodyear welt factories in the United States. It procured none of the Goodyear welt machine types used in Israel for its United States factories. He remembered seeing only one foreign machine in any domestic Genesco factory, an Albeko Band Knife Splitter, which was a machine type also purchased in 1953 by Hanover.

Mr. Major. Mr. Major's testimony was similar to that of Mr. Swinney.

Mr. Walker. While he was manager of United's Milwaukee territory in the 1930's he saw five foreign machines of the key type installed in domestic shoe factories: a Moenus Staple Side Laster, Heel Seal Laster Pulling Over, Welter and Stitcher and a Standard Welter. These machines "did a passable job; I

don't think any machines are necessarily comparable to the performance of United machines." Most of the machines were not even rated as passable on United's Outside Machine Reports (O.M.Rs.), prepared by him or under his direction, and on other United documents prepared at the time he saw the machines. The Moenus welter was not used at all during a particular week because a German mechanic was working on it, and the operator was having considerable trouble with it. Later the machine was removed as unsatisfactory, and replaced by a United machine. Subsequent reports indicated that the seller was having trouble placing the machine in another factory for trial. The Standard Welter, installed in the same factory, was removed in 1937 as a "total failure." The only machine type other than key machine types was a Montreal or a Moenus sole layer which he also rated as passable.

Some foreign machines were described on O.M.Rs. as "man killer," "unsatisfactory," and "total failure." He attempted to explain these ratings by stating that he thought that the factories were not interested in making the machines run, and it was not his job to encourage or make it possible to make the machines a success. He thought the machines could have performed satisfactorily.

The explanation is not convincing. It is unlikely that a concern would obtain a machine on a trial basis, and have its organization disrupted in an attempt to operate it, if it was not interested in seeing it run. Whether Mr. Walker was not interested in seeing it run, or in not encouraging its success, is immaterial. He was an outsider in no way connected with the potential seller or buyer. No one would expect him to breach his loyalty to his employer by encouraging or aiding in the success of a competitor's machines. One would expect him to be factual in his reports to his employer. If a machine was not unsatisfactory, an unqualified rating to that effect would be of little value to United.

Mr. Becka. For a long time he had been familiar with foreign shoe machinery and with United machinery, since " * * * United machines were practically the only machines * * * ". In 1954 he made a trip to Europe to examine shoe machinery. Five machine types—heel seat lasters, stitchers, rough rounders, staple side lasters and pulling over machines—were " * * * equally as good and suitable for use in Canadian or American shoe factories." Foreign machines brought here must be modified for such things as the particular way they are to perform, electrical requirements, custom installation, and the like. A shoe manufacturer could not very well modify the machines unless it also went into the shoe machinery business. Two American shoe manufacturers had equipped their factories with machinery other than United, but both had machine shops equipped for the manufacture of machinery. In the distribution of foreign machines, the spare parts, service, and technical know-how are of major importance, and a shoe manufacturer could not acquire foreign machines without an assurance of a local supply of parts and availability of local service. There were only four organizations which offered this service. He knew of only a few Goodyear welt foreign machines in place in United States shoe factories prior to 1955.

Mr. Becka's observations were limited to about one year prior to the complaint period, and are at variance to data and reports accumulated by United. And there is no evidence that Hanover had facilities for the manufacture of shoe machinery. It is not necessary to detail Mr. Becka's testimony of the four shoe organizations. It is sufficient to say that none would have been adequate if Hanover had purchased foreign machinery.

There is other evidence of the nonavailability of acceptable foreign machinery. Mr. Sheppard testified that Hanover would not purchase machines that would not do the work of United machinery because of Hanover's policy

of high quality performance and production. He testified that whenever foreign machines suitable to Hanover's needs were found, they were purchased and substituted for United machines. Also, in the Government case United requested the court to find as a fact that as of 1952

> " * * * The evidence is clear that shoe manufacturing practices in Great Britain and continental European countries vary markedly from those of the industry of this country; that the productivity of such foreign factories is universally below that of American factories; that the high production of the American industry is not a requirement of these foreign industries; and that machine and operating characteristics acceptable abroad are not acceptable to the industry of the United States. The main reason for the production superiority of the shoe industry of this country lies in the machinery developed and introduced by United. * * * "

In a communication, dated July 7, 1952, United recognized that " * * * The war brought about a cessation of activities, not only of those [European shoe machinery] companies, but of our own foreign companies to a considerable extent, and in some instances the plants of foreign shoe machinery manufacturers were damaged." The communication also noted that of late, foreign manufacturers had recovered from the effects of the war and were making efforts to introduce their machinery into the United States, indicating United's awareness of the absence of foreign machines during the period from the war to 1952. Such foreign machines were described as copies of United's older existing models, and while many were listed as good machines, the communication stated that this rating was " * * * based on performance under European conditions where the requirements are normally much different from those existing in this country, * * * ", and that United machinery " * * * can deliver superior performance under the conditions and requirements of this country * *." The list included key and other machine types used in the Goodyear welt process. Most of the key machines were by Moenus, Adrian & Busch, Standard and Sagem. .

A statement by Mr. Purtell that the purchase policy was set up only after the availability of United's lease-only machinery is urged by United wholly out of context. The record shows that this statement was confined to the lease-only machines purchased in 1955–1956. Previously, he had been asked whether from the beginning of his employment in 1949 he was aware that Hanover had a policy to buy shoe machinery. He answered, " * * * I believe we purchased machines that were—whether it be "United's or anyone else's, that were available, on a purchase basis, * * * " but that during those years most major United machinery was necessarily on lease. Also, United's O.M.Rs. in 1951 stated that Hanover preferred to purchase as many machines as possible, thereby eliminating unit charges.

On the evidence in this case the conclusion is inescapable that there was very little suitable foreign machinery available and then only toward the end of the complaint period.

But even if foreign machines were comparable in all respects to United machines, it does not mean that shoe manufacturers were free to procure them. High production in short runs is a characteristic of the shoe industry in the United States, and this makes work stoppage due to parts and service difficulties a major problem. Hanover regarded adequate service and a ready supply of parts a most important factor in the purchase of shoe machinery, particularly the more complicated types. In 1952 United recognized the effort "of late" of European shoe machinery manufacturers to introduce their machinery into this country, their plants having recovered from the effects of World War II. The vice president and general man-

ager told the branches, "* * * We are also sure you have in mind the high standard of our service, and we mean that in the broadest sense, the rapidity with which we can adapt styles and conditions, and the availability of our stock of replacement parts. Experience both in this country and abroad indicates you cannot emphasize too strongly the fundamental importance of this parts stock." [12] United recognized the importance of adequate parts for foreign machines installed in domestic factories in the 1950's. Their O.M.Rs. for that period state that a Moenus heel seat laster, and a Standard outsole lockstitcher were unsatisfactory for the reason, among others, that parts service was poor.

■ Thus, with very few exceptions, it is clear that no domestic non-United or foreign machines, comparable to United machines in capacity and performance, and for which there was service, parts and technical advice, were available to Hanover.

Hanover had sufficient finances to purchase. It had ample working capital. During 1939 and 1940 its current and total liabilities were minimal in relation to current assets, and even to quick assets. United's expert, Dr. Corson, a management consultant on problems of economics, marketing, finance, personnel administration and organization, testified that Hanover had sufficient funds to purchase the machinery here in question without borrowing additional capital. If it had borrowed in 1939, its financial condition was such that the interest would have been at the then prime rate of 1½ percent, or at most 2 percent.

■ Finally, United argues that the rental and royalty payments, even if higher than the costs of purchase, could not have injured Hanover because the lease terms were uniform among all shoe manufacturers, citing Keogh v. Chicago & Northwestern Ry. Co., 1922, 260 U.S. 156, 165, 43 S.Ct. 47, 50, 67 L.Ed. 183:

"* * * Here the instrument by which the damage is alleged to have been inflicted is the legal rate, which, while in effect, had to be collected from all shippers. Exaction of this higher legal rate may not have injured Keogh at all; for a lower rate might not have benefited him. Every competitor was entitled to be put—and we must presume would have been put—on a parity with

12. Later in 1952, United's Research Department, after reporting on foreign machines of different types and manufacture, concluded that:

* * * * *

"Assuming the fact that most foreign shoe machines will eventually live up to our high standards of quality and production, the quantity of major machines of foreign make installed in the U. S. will depend on the efficacy of a suitable maintenance service and parts stock.

"Further assuming that the distribution of these machines and their maintenance service would be handled by companies with branches in the nation's shoe centers such as I.S.M.C. and Compo Shoe Machinery Corp., the parts supply would, to say the least, present a serious problem to their agents. It would be most costly to import spare parts and stock them in sufficient numbers at strategic points, a fact which would reflect in the shoe manufacturers' overhead.

"Should the United States agents of foreign shoe machinery manufacturers decide to produce spare parts for foreign machines in this country, the cost of fixtures, jigs, etc. for so many various models of different make would make the capital outlay seem prohibitive in view of the limited market.

"* * * The shoe manufacturer who has acquired foreign machines at a comparatively low purchase price would also be forced to invest in a costly spare parts stock and to employ a trained staff of mechanics for the maintenance of these machines in an adequately equipped workshop. This, in our opinion,—would tend to offset, if not wipe out, the initial saving derived from the purchase of a lower-priced machine and would increase the manufacturing cost of footwear. The above would be true with all major machines such as pulling over, side lasting, outsole stitching, and inseam sewing machines.

* * * * *

"We, therefore, assume that, while a few major foreign machines may find their way into domestic factories, there is at this time not too great a danger of any mass import. * * *"

him. And for every article competing with excelsior and tow, like adjustment of the rate must have been made. Under these circumstances no court or jury could say that, if the rate had been lower, Keogh would have enjoyed the difference between the rates or that any other advantage would have accrued to him. The benefit might have gone to his customers, or conceivably, to the ultimate consumer."

The Keogh case differs significantly. The action was brought under Section 7 of the Sherman Act against several railroads who were charged with combining to fix unreasonable rates. United was not a public utility and was not regulated. Its rates were not fixed. United was not required to charge uniform rates, and Hanover was not required to accept and pay the same machinery costs as its competitors. If Hanover could have reduced machinery costs by purchase, it should have been free to do so. Competitors might not have had the financial ability, or the borrowing capacity, or the foresight to purchase. It might have been advantageous for some of them to lease and not to purchase. The other manufacturers were not entitled to be put on a parity with Hanover. Consequently, an option to purchase, as distinguished from a uniform rate, might have benefited Hanover. Some manufacturers might not have had a cause of action. Hanover and its claim are unaffected by those who had a cause of action, and did not pursue it, or failed in the attempt.

 Hanover has proved that as a consequence of United's monopolization it was unable to purchase most of the more important machines which it would have purchased had they been available.

E. Damages.

1. The Leidesdorf Calculations.

The primary damage claimed by Hanover is the excess of leasing costs over what it would have cost to own the same machines had they been available for purchase during the period from July 1, 1939, to September 21, 1955. This required, among other things, a determination of what the purchase prices would have been. The first time the lease-only machines were offered for sale was in 1955 when United established prices for the sale of its machines new (1955 prices). Hanover's proof consisted of the following steps.

a. The cost to Hanover of the machines presumably purchased by it in 1939, or in any subsequent year when additional machines or replacement machines were presumably acquired by it, was determined by applying the Bureau of Labor Statistics Consumer Price Index, All Items, for the years of acquisition, to the 1955 prices.

b. The cost so determined was reduced by the residual value of (1) machines deemed to have been disposed of at the end of an assumed life expectancy and (2) machines on hand on September 21, 1955, the date of the commencement of this action. The reduction was determined by first applying to the 1955 prices the discount table that had been negotiated between United and N.S.M.A. pursuant to the order of the district court (the discount table). Then the Bureau of Labor Statistics Consumer Price Index, All Items, for the years of disposition prior to 1955 was applied to the discounted prices.

c. The difference between a. and b. was subtracted from the total rents and royalties paid by Hanover during the complaint period.

d. The estimated cost to Hanover of servicing the machines it presumably purchased was deducted from the remainder. For the 20 major machine types this service cost was based upon the actual service costs Hanover incurred when servicing the 20 major machine types during the year September 1, 1961, to August 31, 1962. No allowance was made for the lower costs that would have been incurred during the complaint period. For the remaining 37 machine types, the service cost was determined by taking that proportion of the service

costs for the 20 major machine types for the year ending August 31, 1962, which rents and royalties paid on such 37 machine types bore to the rents and royalties paid on the 20 major machine types.

Three separate calculations were prepared by S. D. Leidesdorf & Co. (Leidesdorf), Certified Public Accountants, all of which are based substantially on this method, differing mainly in the life expectancy assumed for the various machine types. One was based on a study of the life expectancies made by Professor Joel Dean, an expert employed by United, and used by it in the course of the negotiations with the N.S.M.A. A second was based on a fifteen year life expectancy, accepted by the Internal Revenue Service for shoe machinery, for all machine types. The third was based on a life expectancy determined from the actual shipments of machines by United to Hanover, and the actual returns of machines by Hanover to United. The damages shown by the three calculations vary between $1,821,431.77 and $1,836,060.90.

United raises several objections to this proof, which it contends renders it "speculation or guesswork" and not within the guidelines established in Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156, 43 S.Ct. 47, supra, and Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

The first objection is that the Leidesdorf calculations are merely mathematical calculations based on assumptions which have not been proven.

The Discount Table. United says it accepted the discount table under the pressure of the decree and the supplemental opinion of March 8, 1955, in the Government case, and after strenuous bargaining with N.S.M.A., and that Hanover used it, without further proof, in fixing the salvage value at given dates of the machines assumed to have been purchased at prior dates.

Hanover was faced with the necessity of establishing a value for machines on hand at the date of commencement of the action, or which had been disposed of previously, to be deducted from the computed costs of machines assumed to have been purchased to arrive at a computed net cost of ownership. Since there was no market price for secondhand machinery, Hanover used the discount table which reflected age and other conditions. It had no alternative.

■ United offered testimony that the prices established by application of the discount table did not take into account actual value. This cannot be accepted. Value has different meanings to different persons. The discount table was negotiated. Negotiation is a process of submission and consideration of offers until an acceptable offer is made and accepted. United States v. John McShain, Inc., 1958, 103 U.S.App.D.C. 328, 258 F.2d 422, 424, cert. denied 1958, 358 U.S. 832, 79 S.Ct. 52, 3 L.Ed.2d 70. United's contention, in effect, that it was forced to agree to such prices, is without merit. The decree required United, within certain time limits, only to present a plan for the termination of outstanding leases and for the sale of the lease-only machines. There was no attempt to dictate prices, or to force United to accept unreasonable lease and sale terms. Judge Wyzanski's supplemental opinion merely required United to disclose the data on which Joel Dean's calculations were based. Its purpose was to remove unnecessary roadblocks in the negotiations. It did not force terms on United or require it to accept the terms of N.S.M.A. United offered no evidence that the sales prices were in fact unreasonably low. The use of the discount table was proper.

Date of Commencement of Action. The salvage value of machines assumed to have been purchased is supposedly increased because the discount table assumes September 21, 1955, as the correct date for cutting off the estimated life of the machines, thereby diminishing the net cost of ownership. United has not suggested any other date.

The applicable statute of limitations is measured from the date the action was begun, September 21, 1955. Since this is the end of the damage period, the comparison of rental costs to cost of ownership would have to include machinery values established no later than September, 1955, for those machines assumed to be on hand at that date.

The 1955 Prices. United next argues that the sales prices constructed by Hanover assume, without any proof, that if prices were established by United for machines in 1939 and subsequent years, it would have established the prices so constructed, even though the 1955 prices were fixed under 1955 economic conditions, and under the mandate of the decree providing that sales prices could not be fixed so as to make it substantially more advantageous to lease, and that this is sheer speculation because those economic and legal conditions did not exist in 1939 and later years.

The issue is whether the prices computed by Hanover are reasonable. Dr. Corson testified that the 1955 prices, with the application of a proper index, were essential to the calculations. The 1955 prices have been adjusted to reflect economic conditions existing at the time the assumed purchases were made. The limitation that it could not be more advantageous to lease did not depress prices, because rents and royalties were not fixed or regulated. United had complete freedom to fix its lease terms and sales prices at any level. The limitation is not material to the reconstructed prices. The 1955 prices were not an assumption but a fact. The consumer price index used was also a fact.

Machine Shipments and Returns. United next argues that the Leidesdorf calculations include a practical suppression of machine returns, which occurred often, in that returns " * * * are treated most artificially through a series of accumulations until the totals accumulated reach the totals previously leased, when the deductions are made to show a putative transaction of indefinite character looking like a re-sale * * *,"

and whether or not this treatment favors United, the result is " * * * unjustifiable as a matter of principle in falsifying the facts concerning machinery returns by which the court and the parties are bound in the ascertainment of 'damages' "; that " * * * ignoring returns under Form A leases until cumulative returns had exceeded cumulative shipments, is only another indication that the Leidesdorf procedures rest on the speculation that every machine in fact returned could and would have been promptly sold upon a different market at an established price * * *."

The argument is not clear and appears to misconstrue the manner in which machine returns were considered in the calculations. As a part of its approach, Hanover had to determine how many machines, if purchased, would have been required to maintain its production. Between 1939 and 1955 machines were received from United and returned to United. Hanover did not credit itself with the return of a machine because the shipment and return data showed the return in a particular year. This was in order not to take advantage of returns a lessee, and not an owner, might make because of cyclical fluctuations in production. Hanover credited itself with returns only to cumulatively offset shipments at a given time, and shipments were considered purchases only when shipments exceeded returns at a given time. This is reasonable and does not render the calculations speculative or conjectural. If Hanover had used individual returns, it would have increased the damages. United has not proved that a consideration of individual shipments and returns would decrease the amount of damages.

2. Elements Not Included in the Leidesdorf Calculations.

United attacks the Leidesdorf calculations because cost of capital, future worth and taxes .are not included, and a proper index was not used.

Cost of Capital. The Leidesdorf calculations do not include cost of capital. Cost of capital is an economic concept which has been defined as "the rate of

return expected by investors on capital funds they place at * * * [a concern's] disposal." Dr. Corson testified that a company usually gets its capital in four ways: debt, preferred stock, common stock and retained earnings, and that during the damage period Hanover derived its capital from the sales of common stock and retained earnings. He computed Hanover's cost of capital in two ways. First, he took the percentage of earnings per share to the price per share of common stock for the seven years (1940, 1941, 1942, 1948, 1949, 1950, 1951) in which common stock was sold. The weighted average was 22.14 percent. He also took the percentage of net profit after taxes to stockholders' equity for the years 1939 to 1955. This average was 14.1 percent. Using the 14.1 percent, Dr. Corson made certain adjustments to the calculations. He concluded that purchases would not result in an investment return greater than the cost of the capital invested, and that the purchases were economically unsound.

If cost of capital is a necessary element of the damage calculation, the rate used by Dr. Corson does not reflect the true cost that Hanover would have had to pay or offer to attract capital. The measurement of cost of capital is vague. "Quite apart from the practical difficulties of measuring capital for a specific company, there is today no explicit and generally acceptable account of what is the correct concept, actual approach to its measurement. * * * The best known exception is the work of Professor Joel Dean but even his most comprehensive statement regarding the cost of capital is neither explicit nor complete." Solomon, The Management of Corporate Capital. Dr. Corson cited this work and that of Joel Dean in support of his testimony. "A person who desires neat solutions with one correct answer should avoid the computation of a corporation's cost of capital. Usually such an answer is impossible. If ten 'experts' independently computed the cost of capital of the IBM Corporation, there would be ten answers." Bierman & Smidt, The Capital Budgeting Decision. While Dr. Corson also cited this work, he disagreed with this particular view. Dr. Cyert, Hanover's expert, agreed with these authors, and listed other authorities who emphasize the difficulties in the measurement of the cost of capital.

The inexactness in its measurement is demonstrated by Dr. Corson's averages of 14.1 and 22.14 percent. The percentage of earnings per common share to price per common share ranged from 7.8 percent in 1940 to 54.5 percent in 1948. The percentage of net profit after taxes to stockholders' equity, while not fluctuating as sharply, ranged from a low of 6.72 percent in 1945 to a high of 32.59 percent in 1947. To demonstrate the inexactness also, Hanover suggests that the percentage of earnings per share to the sales price per share on a secondary issue of Hanover stock in 1956 was 8 percent. This was the first public sale of Hanover stock. Prior to that time, stock acquisition rights were limited to descendants of the original founders of the company, and certain key employees, and sales were at a discounted price reflecting book value after certain downward adjustments of capital and surplus in accordance with a predetermined formula. Both experts agreed that in measuring cost of capital in this way market value is used, and if there is no market value, then the market value of stock of similar companies. Yet, Dr. Corson was satisfied with discounted sales to family and key employees. Mr. Spence, who for many years dealt in corporate stock and securities matters, testified that during the damage period Hanover's stock, if publicly sold, would have had a market value of a minimum of ten times earnings, and probably as high as 13 times. This would indicate a cost of capital of 8 or 10 percent. Mr. Spence's opinion was based in part on the market value of stocks of other shoe manufacturers. Dr. Corson thought that the 1956 public issue was not relevant to the damage period, and that the market price of stocks of similar companies were not material because his figures

were the actual cost of capital experienced by Hanover. This ignores the fact that the bulk of the assumed purchases would have been in 1939. The evidence shows that these purchases would have resulted in a cost of capital different than that actually experienced during the damage period.

Hanover had other sources of capital. It made substantial loans in 1942 and in 1951 at interest rates of 2 to 2.5 percent. In 1942 it borrowed $300,000 without interest from two of its "family" stockholders. The borrowings were infrequent and for the most part relatively small—5.8 million during the same period, with 2.1 million the largest amount outstanding at any one time. ($535,000 is the approximate cost of the machines to Hanover in 1939.) Dr. Corson did not consider debt because he concluded it was not a principal source of capital.

Dr. Corson did not consider preferred stock as a source of capital. In 1946, Hanover issued 2.5 million of preferred stock with a 5 percent dividend. Dr. Corson said capital "was not derived in any significant part from preferred stock * * *." It has enough significance so that it should not have been ignored as an independent source. Moreover, in arriving at the 14.1 percentage, stockholders' equity, to which profit after taxes was compared, included preferred stock. Dr. Corson said this rate was "what the stockholders essentially earned on the money they had supplied and supplied either by the purchase of stock or by the retention of earnings * * *." The preferred stock was non-participating, and, thus, to the extent that such profit exceeded the preferred dividend rate, it does not represent what preferred stockholders earned on their capital.

Dr. Corson admitted that his figures do not represent a cost in an accounting sense. He testified that a concern which has a cost of idle capital of 14 percent and which borrows additional capital at 2 percent, and invests it at a 10 percent return, makes a profit for income tax purposes, but suffers an economic loss.

He testified that an economic loss and actual profit and loss are not the same, and that such an economic loss, while difficult to identify in the profit and loss statement in any year, in the long run will be reflected in the profit and loss statement. To include the cost of capital in Hanover's damage calculation would require an examination of the wisdom of every corporate investment. While Dr. Corson admitted that Hanover at all times had sufficient capital to purchase the machines, there is no evidence why Hanover borrowed from time to time. In many instances the loans were less than the amounts of the assumed capital purchases. Such a corporate decision to borrow funds, under Dr. Corson's testimony, would be unwise. It illustrates that a company may choose to act notwithstanding the cost of capital indicated that it should not.

Dr. Cyert, on the other hand, emphasized that the cost of capital is only a decisional guide which should form no part of a damage calculation.

In The Borden Co., 1962, 3 CCH Trade Reg.Rep. para. 16,191, a Federal Trade Commission case, Borden attempted to defend a charge of illegal price discrimination under the Robinson-Patman Act on the ground that differences in prices resulted from differences in costs. One element of cost was "Investment Cost" which appears to be of the same nature as the cost of capital. The Commission rejected it as a proper cost item:

"Respondent's cost study fails for other reasons. For instance, it claims an 'Investment Cost' difference of $.0404 per case. Respondent apparently kept larger inventories of Borden brand evaporated milk than of the private label. In its analysis, it concludes that the money invested at 8% resulted in an inventory cost of $.0835 per case for Borden brand and an inventory cost of $.0257 per case for private label. The fallacy in this position is that the so-called 'Investment Cost' is not an actual, incurred cost at all; it

amounts to a return on capital investment. Accordingly, this item is rejected for cost justification. Cf. Thompson Products, Inc., 55 F.T.C. 1252, 1265–1266 (1959)."

On the record there is no clear measurement for cost of capital. Even if measurable, it is not a proper element of the damage calculation. Cost of capital is a guide, not rigid or inflexible, which with other considerations such as opportunity, preference, necessity and the like, may dictate action and policy. Cost of capital, other than interest on borrowed funds, is not an item of cost or expense that would directly affect Hanover's profits and losses in any year. The financial statements and the testimony of Dr. Cyert and Mr. Spence, however, indicate that Hanover would have borrowed the necessary capital for the purchase. The calculations should be adjusted to reflect a 2.5 percent interest rate.

Future Worth. United argues that future worth is a mere matter of compounding the actual machinery investment at the appropriate cost of capital; that its application to the calculations is proper because "Anyone can see that, if Hanover could have put the purchase price of machinery in a savings account and obtained over 16 years a compounded return on its money at the rate of 14%, it would be folly to make the same investment in a purchase that would not earn at least that rate of return."

Future worth does not represent a cost to Hanover. The compounding of alternative investments at the given rate over a given period indicates which investment provides the greatest return. But again it is only a guide. It does not reflect other considerations such as opportunity, preference and necessity. It does not directly affect the profit and loss statements, and would not directly enter into the determination of profit and loss in any year. The damages will include interest on the borrowed funds. Future worth is not a proper element of the damage calculations.

Taxes. Any recovery by Hanover will be subject to taxation in its entirety. Commissioner of Internal Revenue v. Glenshaw Glass Co., 1955, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483. The Leidesdorf calculations do not take into account tax consequences, such as deductions for rents and royalties, and capital gain treatment for machines disposed of at greater than depreciated book value. Generally in tort and in breach of contract actions taxes are not considered in assessing damages. The cases are collected in 63 A.L.R.2d 1393 and 1433. In Cereal Byproducts Co. v. Hall, 1958, 16 Ill.App.2d 79, 147 N.E.2d 383, the court held that an income tax refund received by plaintiff as a result of embezzlements should not be considered in mitigation of damages for defendants' failure as auditors to uncover the embezzlements:

"* * * On defendants' theory every suit for damages would necessitate consideration of the income taxes saved by the plaintiff on account of the loss and the taxes payable on account of the recovery. The same principle applies as would apply in the event plaintiff had carried insurance against these embezzlements. Neither payments by the insurance carrier nor tax refunds can mitigate defendants' liability. The insurance carrier would have an interest in the recovery from the defendants just as the federal government has a tax interest in the recovery by plaintiff. We think that the court erred in giving the defendants credit for the income tax refund."

In the trial on the separate issue, the late Judge Goodrich said: "Things which happen later and let an injured plaintiff escape some of the ultimate consequences of the wrong done him do not inure to the benefit of the defendant. * * *" 185 F.Supp. 826 at page 829, supra. The tax consequences are extraneous to the damage caused by United, and are not a part of the calculations.

Consumer Price Index. There is no price index for shoe machinery. Dr. Corson testified that the Consumer Price Index was not proper for the conversion of shoe machinery prices because the index is constructed to measure commodities that wage earners and clerical workers "purchase as their cost of living" such as food, clothing, toys and the like; and that a more precise index would be a "leasing cost index," which would "relate the prices of shoe machinery in 1955 to hypothetical prices— because that's what we are dealing with —in the earlier years as the rentals in 1955 varied in earlier years." He did not detail the mathematics, but estimated under this index an increase by 20 percent of the excess of cost of ownership over cost of leasing, calculated after the inclusion of the omitted elements. His work papers showed that the computed net cost of ownership was $71,000 less than that arrived at through application of the Consumer Price Index. If the index were the only matter in issue, and Dr. Corson's index were used, Hanover would be entitled to an additional $71,000. However, through application of the omitted elements, this index produced a result by which a computed excess of cost of ownership over cost of leasing went from $949,720 to $1,169,366.[13]

Dr. Cyert testified that the Consumer Price Index is a reasonable indicator of the general price level and the general trend of prices, since it is based on a measure of the cost of living for a large segment of our society, and while there is no measure for everything that happens in our many dimensioned society, the index was reasonable and a proper one for this case. The Consumer Price Index resulted in a relationship of 1939 prices to 1955 prices of 51.9 percent. Using a leasing cost index based on the 20 major machines in the damage calculation, the percentage was 52.9. And with an index developed from United's prices for its optional machines the per-centage exceeded 51.9 only in the case of two of the 58 listed machines. The application of the Consumer Price Index was proper.

Expert Testimony. It is not clear whether United contends that expert testimony was necessary to prove all elements of the calculations. Whether expert opinion is required is a matter within the discretion of the court. Conry v. Baltimore & O. R. Co., 3 Cir. 1953, 209 F.2d 422. Expert testimony is permitted if the court determines it is necessary to aid the fact finder in a full understanding of the issues. Steward v. Atlantic Refining Co., 3 Cir. 1957, 240 F.2d 715. Expert testimony to support the calculations was supplied to the extent needed. Dr. Cyert gave his opinion on the propriety of certain elements used in or omitted from the calculations. The adverse opinion of Dr. Corson clearly defined the issues, so that the court is in a position to decide them. United's criticism of the testimony of Dr. Cyert is not supported by the record. Moreover, the underlying factual data was proved, and the assumptions on which the calculations were prepared were reasonable.

In William Goldman Theaters, Inc. v. Loew's, Inc., E.D.Pa.1946, 69 F.Supp. 103, aff'd per curiam, 3 Cir. 1948, 164 F.2d 1021, cert. denied, 1948, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742, the trial court said:

" * * * Naturally, the plaintiff could offer no record of past performance at the Erlanger. The defendants' wrongful conduct precluded it from doing so. In its place, the plaintiff produced complete data showing the business done and profits earned at each of the other first-run theaters in Philadelphia, including the nearby Mastbaum, during the damage period. Is this evidence sufficient? * * *

"I do not pretend that there is not an element of speculation or guess-

13. Using the Consumer Price Index and including the omitted elements, Dr. Cor-son has computed an excess of ownership costs over leasing costs of $949,720.

work in making an estimate of probable profits on the evidence presented. The fact, however, that only approximate accuracy is required by the decisions of the Supreme Court indicates that no one expects the impossible and that every estimate of what would have occurred under hypothetical conditions is bound to contain elements of speculation. But the evidence, I think, is sufficient on which to reach a reasoned conclusion the basis of which is relevant, informative and logically significant data."

The damage calculations, subject to an adjustment for interest and to the elimination of certain machines, provide an approach and rational basis for a reasoned conclusion.

3. Estoppel.

Hanover is not estopped from contending that cost of capital is a part of machinery investment because of the 1955 negotiations between N.S.M.A. and United. See 31 C.J.S. Estoppel §§ 107 et seq. The discount table, on which the negotiated prices depended, was revised several times during the negotiations. Mr. Salinger, a United witness, testified that prices were arrived at "on a purely bargaining position" without regard to costs, values or any so-called "equivalency formula.[14] To facilitate agreement, the economic experts, all of whom argued for cost of capital, were finally excluded from the negotiations. There is no evidence that Mr. Sheppard, although a member of the N.S.M.A. negotiating committee, ever agreed with the cost of capital concept.

Dr. Robert N. Anthony's report Shoe Machinery: Buy or Lease issued as a guide to N.S.M.A. members also does not work an estoppel. Hanover considered the number of years required to return its investment. This is commonly referred to as the "payback method" which according to Dr. Anthony's report " * * * provides no way of measuring *how much more* * * [than the investment a shoe manufacturer] * * * will get back. * * * " This approach is not a guide to the investment return. The only other cost of capital considered by Hanover in its evaluation was interest on borrowings.

4. Statute of Limitations.

United raises the Pennsylvania statute of limitations as a bar to the admissibility of the Leidesdorf calculations because they include machines on leases executed prior to July 1, 1939.

The Pennsylvania six year statute of limitations and the scope and meaning the Pennsylvania courts give to it in analogous suits govern this action. 12 P.S. § 31; [15] Chattanooga Foundry and Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241, supra; Gordon v. Loew's, Inc., 3 Cir. 1957, 247 F.2d 451; Shapiro v. Paramount Film Distributing Corp., E.D.Pa.1959, 177 F.Supp. 88, aff'd 3 Cir. 1960, 274 F.2d 743. The time when the cause of action accrues, however, is a federal question to be determined by federal law. Momand v. Universal Film Exchange, Inc.,

---

14. Andrews, Anthony & McLean—Sales Prices for Outstanding Shoe Machinery, at page 10: "For the limited purpose of fixing the starting point in the calculation of secondhand prices and without conceding its correctness for any other purpose, we accept the concept of 'economic equivalence' used in the Dean Report—that is, 'a set of lease terms and a sale price so related that it will be a matter of indifference to the shoe manufacturer if he acts solely in his economic best interests, whether he elects to lease or to buy' and 'an equivalent price is one that makes ownership costs just equal to leasing costs'." (Footnotes omitted.)

15. Although the statute of limitations is six years, the damage period is from July 1, 1939, to September 21, 1955, as a result of the tolling provisions of the Clayton Act, 15 U.S.C.A. § 16, prior to its amendment on July 7, 1955, and the Wartime Tolling Act, Act of October 10, 1942, c. 589, 56 Stat. 781, § 1, as amended June 30, 1945, c. 213, 59 Stat. 306.

D.Mass.1942, 43 F.Supp. 996; Delta Theaters, Inc. v. Paramount Pictures, Inc., E.D.La.1958, 158 F.Supp. 644.

In Cardinal Films, Inc. v. Republic Pictures Corp., S.D.N.Y.1957, 148 F. Supp. 156, defendant granted plaintiff an exclusive license to distribute prints of 30 motion pictures, provided plaintiff ordered from defendant exclusively all prints required for distribution of the pictures. Defendant furnished plaintiff with 658 prints, and because plaintiff was unable to get the film processing done elsewhere, under the agreement, it brought an action charging defendant with monopolization, restraint of trade, and the enforcement of an illegal "tie-in" provision. It alleged that defendant charged higher prices for the prints than it charged to other purchasers of similar prints, and higher prices than plaintiff could have obtained from other film processors. The court held that the statute of limitations did not bar a recovery for prints furnished during the period not barred, pursuant to the license agreement which had been executed in the period barred:

"* * * It appears that of the 658 prints of the licensed pictures furnished by defendant to plaintiff under the contract, only 46 were furnished within the four year period. Inasmuch as plaintiff complains of a continuing violation of the antitrust laws, only so much of his damages as are attributable to those 46 prints are beyond the bar of limitations, if he has a valid cause of action. The situation is not like those in cases involving a statute of limitations in connection with continuing conspiracies. * * * While action does not lie for a continuing conspiracy as distinguished from the overt act that puts it into execution, action does lie for a continuing violation such as is here alleged. * * * The continuing violation involves the defendant's conduct (if it be a violation) in continuing the practices complained of under the

contract. If more affirmative action on the part of the defendant causing damage to the plaintiff is required, * * * it may be, as alleged in plaintiff's affidavit, the defendant's refusal to relieve the plaintiff of the restriction in the contract. At least an issue of fact on that point is raised."

United attempts to distinguish Cardinal Films because the license agreement was not self-executing—Cardinal was to order the films it would distribute. This distinction is without substance. The right to distribute the motion pictures was meaningless unless Cardinal obtained the prints. Cardinal could escape the consequences of this requirement only by not taking advantage of its contractual right to distribute the motion pictures. Both the Cardinal agreement and the Form A leases were executed prior to the limitations period. Both defendant (Republic) and United could have changed their conduct, which was a continuing violation of the law.

In Muskin Shoe Company v. United Shoe Machinery Corp., D.Md. 1958, 167 F.Supp. 106, which concerned United's Form A leases, the court held the antitrust injury was inflicted when the leases were executed, and that payments made during the period not barred by the statute, but pursuant to leases executed during the period barred by the statute, could not be included in the damage calculation. While a decision by another district court is entitled to great respect, the Muskin decision to the extent that it supports United's contention will not be followed in this case. The court reasoned:

"* * * Plaintiff's claim of damages with respect to each lease on which it may be entitled to recover will require a consideration of the difference, if any, between the payments called for by the lease and the payment or payments which would have been reasonable under competitive conditions at the time the lease was made. This consideration will

require complicated calculations with respect to each type of machine and each date of leasing. If similar calculations had to be made for every date on which a payment under every lease fell due or was made, the detail would be overwhelming. The general rule is the common sense rule in this case."

The extent of the detail should not control the proof of Hanover's claim. This burden falls initially and primarily on Hanover, and United cannot escape the consequences of its acts because it put Hanover to the task of accumulating a mass of detail. Moreover, Hanover's proof does not constitute overwhelming detail. United had ample opportunity to question the Leidesdorf calculations. Also, in Muskin the damages and injury were alleged to be the result of the unreasonable rental charges. Plaintiff conceded the legality of the leases, while at the same time it sought to void the rentals by the antitrust action. Hanover's alternate damage claim, which is the unreasonableness of the rental and royalty charges, has been disallowed. Its primary damage claim is not an attack on these charges. The injury and claimed damage flows from a continuing violation of Hanover's right to deal in a free market. Recovery measured by the difference between payments made after July 1, 1939, pursuant to leases executed prior to that date, and the assumed cost of ownership, is not barred by the Pennsylvania six year statute of limitations.

This conclusion finds support in other cases. In Streiffer v. Seafarers Sea Chest Corp., E.D.La.1958, 162 F.Supp. 602, a conspiracy case, in speaking generally on the accrual of a cause of action under the antitrust laws, the court said at page 606:

"Under these circumstances it is more appropriate to analogize the antitrust suit to actions for injuries to real property, and, in particular, to actions arising out of a continuing, but abatable nuisance, where the incidence of continuing damage may depend on speculative factors, including the uncertain operation of the seasons. In such cases, and in antitrust cases, the rule is that the cause of action accrues on the occurrence of actual damage, and successive damage gives rise to successive causes of action against which the statute of limitations will run as they accrue day by day." (Footnotes omitted.)

In Highland Supply Corp. v. Reynolds Metal Co., 8 Cir. 1964, 327 F.2d 725, a non-conspiracy case, the complaint charged that defendant's 1956 acquisition of a company and its 1957 cutting of prices permitted it, in violation of Section 7 of the Clayton Act and Section 2 of the Sherman Act, to monopolize the florist foil market, which resulted in a loss of sales, lower sales, a prevention of normal increase in sales, and other consequences. The district court held the action was barred by the statute of limitations because the acquisition and price cutting actions, which caused the injury, occurred more than four years prior to the filing of the complaint in 1963, even though plaintiff continued to suffer damages during the four years preceding the filing of the action. The court of appeals reversed:

" * * * Appellant's complaint, liberally construed (as it should be under Rule 8(f), F.R.C.Pro., 28 U.S.C.A.), makes claim for damages because of appellee's violation of Section 2 of the Sherman Act, supra, during the entire time that Reynolds possessed monopoly power. The statute of limitation in respect to a private right of action under Section 5(b) of the Clayton Act, supra, 'beg (ins) to run when the cause of action (arises), and the cause of action (arises) when the damage occur(s).' Then only can the action be brought. * * *

"Irrespective of the date of 'acquirement' of Arrow by Reynolds, or the first 'price-fixing' date as considered by the District Court, we

must rule that the instant complaint reveals facts as to abuse of 'monopoly power' which under proper showing, injury and damage to appellant's business might possibly be established within the limitation period as provided in Section 5(b) of the Clayton Act. To hold otherwise, as the District Court ruled, is to say that some damage that might have been sustained by appellant was barred before it accrued; i. e. before appellant sustained injury to its business or property because of appellee's continuous violation of Section 2 of the Sherman Act. The question is simply one of factual proof.

"Damages claimed in a private antitrust suit must be different from those suffered by the general public —i. e. they must be special to the claimant. * * * It is existence of monopoly power and the exertion thereof on the business of a competitor, in a relevant market, that gives rise to such a claim. * * * Such right of action may arise from day to day. * * * It is well settled that where a private cause of action under the antitrust law is based upon a continuous invasion of one's rights, his cause of action accrues from day to day as his rights are invaded to his damage. * * * "

See also Delta Theaters, Inc. v. Paramount Pictures, Inc., E.D.La.1958, 158 F.Supp. 644, 649; Susser v. Carvel Corp., S.D.N.Y.1962, 206 F.Supp. 636, 651–652, aff'd 2 Cir. 1964, 332 F.2d 505.

 Both parties have cited cases involving an interpretation of the Pennsylvania two year statute of limitations in personal injury actions not resulting in death. 12 P.S. § 34. Hanover had a continuing right not to be injured in its business or property in the manner asserted under the facts of this case. The Pennsylvania statutes of limitations which involve continuing injuries to property limit the damage period to six years

before the commencement of the action. See cases collected in Daniels v. Beryllium Corp., E.D.Pa.1962, 211 F.Supp. 452, 455, n. 4.

 Daniels was a diversity case in which Pennsylvania law was applied. Plaintiff became ill in 1949; her condition was diagnosed in 1953 as beryllium poisoning, and the action was filed on July 1, 1958. In considering the limitation in 12 P.S. § 34, District Judge, now Circuit Judge, Freedman held that the statute began to run in 1953 and the only recoverable claim was for the additional poisoning that occurred between July 1, 1956, and July 1, 1958. There is no question that if the action had been started within two years of 1953, there would have been recovery for the period from 1949. There is no evidence that Hanover knew or should have known of United's illegal monopolization before 1939. United's charge that Mr. Sheppard knew of United's wrong since 1921 is not supported by the record which shows only that he was dissatisfied with United's policies. Even if Mr. Sheppard did know prior to 1939 that United's acts provided a basis for a cause of action, as long as United continued to monopolize the shoe machinery market Hanover could bring an action for the continued monopolization within the six year period, just as the plaintiff in Daniels could bring an action for the continued contamination within the two year period.

The Pennsylvania six year statute of limitations does not render the Leidesdorf calculations inadmissible.

5. The Passing-On Defense.

This contention is that since Hanover paid the same lease charges as its competitors, and passed these charges on to its customers, there has been no damage. United insists that the ruling of Judge Goodrich that the passing-on of damages is not a defense in this action (185 F.Supp. 826, supra) does not foreclose this court from deciding on the facts that no damage was sustained, because Judge Goodrich assumed an anti-

trust violation, assumed excessive charges amounted to injury, and did not get to the issue of whether the damages were in fact passed on.

■ United relies on Judge Goodrich's statement that "The Court thinks this argument [of passing on] is invalid; otherwise, it would be necessary to go into the evidence concerning the factual accuracy of the argument." Judge Goodrich also said, " * * * that where the plaintiff is a consumer of the product, rather than a middleman who resells it, he may recover the excess paid whether or not he has ultimately passed the excess along to his customers." Moreover, the hypotheses on which Judge Goodrich proceeded have been proved in this trial. His decision is controlling.

United argues, however, that the distinction between a middleman and a consumer, on which Judge Goodrich based his decision, and which was reaffirmed in Freedman v. Philadelphia Terminals Auction Co., 3 Cir. 1962, 301 F.2d 830, is an unsound distinction, and that the correct principle is that adopted in Wolfe v. National Lead Co., 9 Cir. 1955, 225 F.2d 427, cert. denied 1955, 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802. The Third Circuit cases will be followed. See also Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., N.D.Ill.1963, 225 F.Supp. 332, aff'd 7 Cir. 1964, 335 F.2d 203; Atlantic City Elec. Co. v. General Elec. Co., S.D.N.Y.1964, 226 F.Supp. 59.

F. Laches.

United cites Tobacco and Allied Stocks v. Transamerica Corp., D.Del.1956, 143 F.Supp. 323, aff'd 3 Cir. 1957, 244 F.2d 902, and Royal Air Properties, Inc. v. Smith, 9 Cir. 1962, 312 F.2d 210, for the proposition that the doctrine of laches is a defense to a suit at law to enforce a federally created right. Neither of these cases supports that proposition. Both involved claims pursuant to Section 10 of the Securities Exchange Act of 1934, and Rule X–10B–5 of the rules issued by the Securities and Exchange Commission, which provided for both legal and equitable remedies. In Tobacco and Allied Stocks, the court held that the enforcement of rights under a section allowing both legal and equitable relief could be limited by both the statute of limitations and laches. The court of appeals affirmed without specifically deciding the question of whether the statute of limitations, or laches, or both, governed.

■ The rights accruing to Hanover under Section 4 of the Clayton Act are enforceable only at law. Fleitmann v. Welsbach Street Lighting Co., 1916, 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505 (this case involves a predecessor to Section 4 of the Clayton Act). Burnham Chemical Co. v. Borax Consolidated, Ltd., 9 Cir. 1948, 170 F.2d 569, cert. denied 1949, 336 U.S. 924, 69 S.Ct. 655, 93 L.Ed. 1086. As stated in Tobacco and Allied Stocks, supra, "[W]here the action is termed one at law for which only legal remedies are available, the court will look to the local law of limitation. * * *" United has cited no case, and research has disclosed none, where laches was applied to a case at law in which damages were sought and no equitable remedies were available. Laches is not a defense. Therefore, a discussion of Hanover's conduct is not required. It is sufficient to say it did not constitute laches.

G. Conclusion and Computation of Damages.

■ This court has jurisdiction of the subject matter of this action and of the parties hereto (15 U.S.C.A. § 2; 15 U.S.C.A. § 15). United violated Section 2 of the Sherman Act (15 U.S.C.A. § 2) by monopolizing the trade and commerce among the several states in shoe machinery, other than dry thread sewing machinery. As a result of United's unlawful monopolization, Hanover was required to pay more for the use of the shoe machinery it needed and used than it would have been required to pay in a free and competitive market. As a result of United's unlawful monopolization, Hanover was injured and sustained damages. The period of time for which

Hanover can recover damages is July 1, 1939, through September 21, 1955.

 An order will be entered requiring Hanover to recompute its damages. This court adopts $1,830,640 as the starting point. This is the average of Hanover's three sets of calculations, as adjusted to reflect the changes in Hanover's Exhibit P–123. Each set of calculations is to be adjusted to exclude damages for the following machines for the periods indicated, because comparable machines were available to Hanover from non-United sources.

| Machine Type | Period |
|---|---|
| Upper Leather Clicking Machine | 1950–1955 |
| Sole Leather Dieing Out Machine | 1941–1955 |
| Sole Laying Machine | 1951–1955 |
| Outsole Rapid Lockstitch Machine | 1939–1955 |

The calculations are to be adjusted to include interest of 2.5 percent, to be computed by the same method used by Hanover in its Exhibit P–53. The calculations as adjusted are to be averaged and the resulting figure submitted to the court.

### SUPPLEMENTAL AND AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

Hanover submitted a recomputation of damages. United filed a response not only to the recomputation, but also to the bases for the damage calculations. Hanover filed a reply.

In reality, Hanover submitted two and one-half sets of calculations based substantially on the method described in part E.1. Two sets of calculations consist of a computation for the 20 major machine types and a separate computation for the 37 lesser machine types. The third calculation, based on Hanover's historical lives, is a computation for only the 20 major machine types. The damages for the 37 lesser machine types to go with this half set were computed by first deriving the ratio of rents and royalties paid on 37 lesser machine types to the rents and royalties paid on the 20 major machine types. This ratio was then applied to the excess of computed net costs of leasing over computed net costs of ownership for the 20 major machine types, Hanover historical lives.

This method was clearly set forth in Hanover's final brief and proposed findings of fact and conclusions of law. United limited itself to a general attack on the calculations, and to items improperly included or excluded. This court adopted the average of three separate sets of damage calculations as reasonable, which included the one-half set for the 37 lesser machine types based on Hanover historical lives.

United now attacks the mechanics of the computation for the 37 lesser machine types and suggests another basis; that is, ascertain the ratio of Hanover's claim for the 20 major machine types on the Hanover historical life set basis to Hanover's total claim for the same machine types on the two other bases, and then apply this ratio to the total claimed damages for the 37 lesser machine types on the other two sets which Hanover put in evidence, that is the Joel Dean lives and 15-year lives. In its reply Hanover did not comment on the merits of United's method but argued it was belated and that the court's figure should be retained as the starting point. If United's contention depended on the reception or consideration of additional evidence, this court would disregard its argument. In damage calculations of this type, however, the question is one of the reasonableness of the approach, in terms of relevant, informative and logically significant data, which can be determined from matters of record. Both the Hanover and United methods meet these criteria. United's method further refines the calculations and is the better one. Accordingly, the court accepts $1,812,965 [16] in lieu of $1,830,640, as the starting point for the recomputation.

16. Rounded to nearest dollar.

Damages for 20 major machine types, Joel Dean lives (P-42 as amended by exhibits P-123 and P-50) $1,630,239.86

plus

Damages for 20 major machine types, 15-year lives (P-37 as amended by exhibits P-123 and P-50) 1,607,922.25

= $3,238,162.11

Damages for 20 major machine types, Hanover historical lives (P-41 as amended by exhibits P-123 and P-50 and other service cost adjustment) $1,577,189.25

or a ratio of .487

———◆———

This ratio is then applied to the total damages for 37 lesser machine types, Joel Dean lives, and 37 lesser machine types, 15-year lives, to arrive at damages for 37 lesser machine types, Hanover historical lives, as follows:

Damages for 37 lesser machine types, Joel Dean lives (P-46 as amended by exhibit P-123 and adjustments for service costs)[17] $205,821.04

Damages for 37 lesser machine types, 15-year lives (P-43 as amended by exhibits P-123 and adjustments for service costs)[17] 213,509.52

$419,330.56
x .487

$204,213.98

17. The adjustments for service costs on the 37 lesser machine types are determined as follows:

| | |
|---|---|
| Amended rental and royalty charges (P-46) | $ 348,026.52 |
| Amended rental and royalty charges (P-42) | $2,133,777.05 = .1631 |
| Amended service costs for 20 major machine types (P-50) | $ 101,803.04 × .1631 |
| Amended service costs for 37 lesser machine types | $ 16,604.08 |

The $16,604.08, together with applicable adjustments shown on P-123 are deducted from rental and royalty charges as shown in P-46 and P-43 to arrive at a new computed net cost of leasing from which is deducted the computed net costs of ownership as shown in P-46 and P-43 to arrive at the damage figure.

The total damages for all machine types, Hanover historical lives, is thus:

$1,577,189.25
204,213.98
_____
$1,781,403.23

———◆———

The average of all the damage calculations is:

| | |
|---|---|
| P-42 and P-46 as amended | $1,836,060.90 |
| P-37 and P-43 as amended | 1,821,431.77 |
| As computed above | 1,781,403.23 |

$3\overline{)5,438,895.90}$ = $1,812,965.30

———◆———

The damage calculations include no claim with respect to the Sole Leather Dieing Out machine type and, therefore, the exclusion from damages for this machine during the period 1941–1955 is not necessary. For the remaining machines for which damages were ordered excluded, the following table shows the average amounts excludable from damages for the respective machine types.

| Machine | Leidesdorf No. | Period | Amount to be Excluded from Damage (averages) |
|---|---|---|---|
| Outsole Rapid Lockstitch Machine | 1 | 1939–1955 | $324,356 |
| Upper Leather Clicking Machine | 12 and 50 | 1950–1955 | 3,128 |
| Sole Laying Machine | 27 | 1951–1955 | 3,019 |
| | | Total | $330,503 |

The interest to be included in the damage calculations is $69,259.

Summary of Damages:

| | | |
|---|---:|---:|
| Average of all damage calculations | | $1,812,965 |
| Less damages for: | | |
| Outsole Rapid Lockstitch Machine | $324,356 | |
| Upper Leather Clicking Machine | 3,128 | |
| Sole Laying Machine | 3,019 | |
| | | 330,503 |
| Net average damages—all machines | | $1,482,462 |
| Less interest | | 69,259 |
| Total damages—to be trebled | | $1,413,203 |

———◆———

In addition to matters related to the recomputation of damages, United and Hanover set forth several arguments, all of which were previously advanced and fully considered by the court. They will not be reconsidered.

## APPLICATION FOR ATTORNEYS' FEES

Hanover was represented by the law firm of Donovan Leisure Newton & Irvine (Donovan), New York, New York, chief counsel, and Nogi, O'Malley & Harris (Nogi), Scranton, Pennsylvania. The recomputed damages of $1,413,203, when trebled, will result in a final judgment of $4,239,609. Donovan seeks a fee of 20 percent of the damages recovered, or $847,922, together with $4,381.87 in reimbursement of necessary travel expenses, and Nogi seeks a fee of 3 percent of the damages recovered, or $127,188.

United concedes the standing of counsel, the magnitude and complexity of the litigation, the responsibility undertaken by Hanover's attorneys, the number of hours expended by counsel, the description of the proceedings, and the disbursements for travel. United contends that the requested fees are grossly excessive and not supported by enough evidence for the court to exercise its discretion. United points to the absence of evidence of the customary worth of counsel engaged, the necessity for the participation of eight lawyers, and the going rate for leading trial counsel in the Middle District of Pennsylvania.

■■ The fixing of attorney's fees is within the discretion of the trial court, reasonably exercised. Some of the factors considered are: (1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the Government, (2) the standing of counsel at the bar—both counsel receiving the award and opposing counsel, (3) time and labor spent, (4) magnitude and complexity of the litigation, (5) responsibility undertaken, (6) the amount recovered, (7) the knowledge the court has of the conferences, arguments that were presented and of work shown by the record to have been done by attorneys for the plaintiff prior to trial, (8) what it would be reasonable for counsel to charge a vic-

torious plaintiff. Noerr Motor Freight, Inc. v. Eastern R.R. Pres. Conf., E.D.Pa. 1958, 166 F.Supp. 163, aff'd, 3 Cir. 1959, 273 F.2d 218, rev'd on other grounds, 1961, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed. 2d 264.

This case was one of great magnitude and complexity. There was a separate four-day trial of the passing-on issue. Hanover prevailed in the district court and in the court of appeals and certiorari was refused by the Supreme Court. Counsel, in the preparation of its case, and in meeting the highly competent and skilled defense of United, was required to prepare numerous briefs and legal memoranda on issues which were novel or which had not been authoritatively settled. The theory of damages was necessarily complex in view of the monopoly and the need for Hanover to meet the standards necessary for an acceptable damage calculation. To accomplish this, counsel had to collect, through numerous requests for admissions, depositions and interrogations, detailed factual data in support of its claim and reply to the defenses. This was a particularly big job in view of the number of machines involved and the period of time—sixteen years—of the damage period of this action. Some of the interrogatories were met with objection with a consequent need for argument and decision. United also availed itself of discovery which in some cases met with objections from Hanover. Fifteen days were spent in taking depositions at various places throughout the country. Much of this data was assembled with the help of certified public accountants and others with whom numerous conferences were necessary. There were several pretrial conferences. The trial lasted 19 days. The record consists of 2,553 pages, exclusive of the closing arguments. Hanover offered 124 exhibits. Many of these were voluminous and without question their preparation required extensive work. United offered 87 exhibits. Counsel for Hanover submitted extensive briefs, reply briefs and proposed findings of fact and conclusions of law.

The proceedings attest to the great responsibility undertaken by counsel. The amount recovered is substantial. Subsequent to the decision in this case and while damages were being recomputed, counsel appeared before the United States District Court for the District of Massachusetts to argue against a belated application for reconstruction of the Government decree, and then appeared before this court to argue against an application for a rehearing based upon the colloquy that transpired in that court. Counsel on both sides have pointed to the uniqueness of many features of this case. In view of these matters, "customary charges" and "going rates," presumably for ordinary litigation, would be of little weight in determining the amount of compensation to be awarded.

The greater part of this effort and time was expended by Donovan. It is conceded that Nogi, whose participation and responsibility was on a lesser scale, actively participated in many aspects of the litigation. It aided in pretrial preparation; participated in numerous pretrial and trial conferences, reviewed pleadings, briefs, and memoranda; participated in all court sessions, and was on the briefs in the appeal of the decision related to the passing-on issue. Total time devoted to this case, all by a senior partner, was 950 hours.

In view of these matters this court finds that attorneys fees of $600,000 to Donovan and $50,000 to Nogi are reasonable. The cases have devised various standards for testing the reasonableness of the fees awarded in terms of percentages and rates per hour.

The fee to Donovan amounts to about 42.5 percent of simple damages and less than 15 percent of the treble damages. These percentages are in line with fees

awarded in recent antitrust cases.[18] At United's insistence Donovan produced its fee arrangement with Hanover. Under this, counsel was to receive 20 percent of the recovery, whether by trial or settlement. United points to the lack of evidence to show the need for the number of lawyers who were engaged in this case, and consequently, the hours spent. Since this court has arrived at the fee award on bases other than the number of hours, the lack of such evidence is not significant. Counsel have submitted figures, which are not disputed, which show that

18. In note 3 of Bal Theatre Corp. v. Paramount Film Distr. Corp., N.D.Calif. 1962, 206 F.Supp. 708, there are collected a number of cases, to which this court has added, which show the following:

| Case | Damages (trebled) | Fee Award | Percent |
|---|---|---|---|
| Twentieth Cent. Fox Film v. Goldwyn, 9 Cir.1964, 328 F.2d 190 | $ 300,000 | $100,000 | 33.33 |
| Union Carbide and Carbon Corp. v. Nisley, 10 Cir.1962, 300 F.2d 561, 587; reversed trial court on issue of damages, but approved 15% of amount recovered as attorneys fees | $4,400,000 | $500,000 | 11.36 |
| Sunkist Growers Inc. v. Winckler & Smith Citrus Prod. Co., 9 Cir.1960, 284 F.2d 1, 4; reversed on other grounds, 1962, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 | $1,447,500 | $195,000 | 13.47 |
| Darden v. Besser, 6 Cir. 1958, 257 F.2d 285, 286; attorney's fee increased from $10,000 to $30,000 by Court of Appeals | $ 135,000 | $ 30,000 | 22.22 |
| Clapper v. Original Tractor Cab Co., 7 Cir.1959, 270 F.2d 616, 626 | $ 82,824.05 | $ 25,000 | 30.18 |
| Twentieth Century-Fox Film Corp. v. Brookside Th. Corp., 8 Cir.1952, 194 F.2d 846, 858; the Court of Appeals reduced the attorney's fee from $150,000 to $100,000 | $1,025,000 | $100,000 | 9.76 |
| Milwaukee Towne Corp. v. Loews, Inc., 7 Cir.1951, 190 F.2d 561, 569; the Court of Appeals reduced the attorney's fee from $225,000 to $75,000 and also reduced the award of treble damages from $1,295,878.26 to $941,-574.30 | $ 941,574.30 | $ 75,000 | 7.97 |
| American Can Co. v. Bruce's Juices, 5 Cir.1951, 187 F.2d 919, 920 | $ 180,000 | $ 35,000 | 19.44 |
| Noerr Motor Freight v. Eastern Railroad Pres. Conf., E.D.Pa.1958, 166 F. Supp. 163, 168 | $ 652,074 | $200,000 | 30.67 |

partner hours totalled 4,849 and associate hours totalled 6,574, for a grand total of 11,423 hours. If we assume that associate time is worth half as much as partner time, then the fee awarded would reflect a partner rate per hour of about $74.00 and an associate rate per hour of about $37.00.[19]

Due to Nogi's limited participation the percentage of fee to the total award is not meaningful.[20] Rule 3 of the rules of this district provides that non-resident attorneys, such as Donovan, shall have associate counsel from this district. Among other things, this enables the court more easily to communicate with counsel and to have before it counsel who, as members of the bar of this court, are responsible to it. The Nogi firm, for the most part, had one man, senior partner Russell J. O'Malley, Esq., engaged in this litigation. The need for at least one man can hardly be questioned. In view of the complexity of this litigation, it is understandable that Donovan would choose counsel of experience and high standing. On the basis of the 950 hours devoted to this cause, Mr. O'Malley and his firm would be compensated at little more than $50.00 per hour. This is reasonable not only in view of Mr. O'Malley's participation in this case, but also because his representation prevented him from being productively engaged in his own practice.[21]

In support of the application for disbursements for necessary travel expenses, Donovan relies on Judge Wyzanski's opinion in Union Leader Corp. v. Newspapers of New England, Inc., D.Mass. 1963, 218 F.Supp. 487. In that case the court, in determining what would be a reasonable attorney's fee, took into account the number of hours which would have been necessary to prove the claim, and necessary disbursements, including disbursements for accountants, of about $8,000, as relevant but not exclusive guides. The court did not allow the disbursements as a separate item of compensation or reimbursement. Allowance of accountants' fees as a separate item was expressly rejected in Twentieth Century Fox Film Corp. v. Goldwyn, supra, 328 F.2d 190, at pages 223–224. The application for travel disbursements as a separate item of compensation or reimbursement will be denied.

Judgment for attorneys' fees will be entered in accordance with this opinion.

*Motion for a Partial New Trial, Etc.*

Pursuant to Rule 59 of the Federal Rules of Civil Procedure and 28 U.S.C.A. § 1651(a), United filed a motion (1) for a new trial on the issues relating to the findings and decree in the Government case as described in this court's opinion; (2) for remission or certification of certain questions by this court to the United States District Court for the District of Massachusetts; and (3) for amendment of this court's findings of fact, conclusions of law and opinion and the entry of new findings of fact and conclusions of law directing dismissal of this action on the merits.

United contends that this court found that the lease-only system was condemned by Judge Wyzanski and that this court, in effect, found a legal duty to sell since the condemnation of lease-only implies as an inevitable logical alternative

---

19. The fee arrangement between counsel and Hanover provided that as a minimum counsel be paid $25 per hour. This rate is not significant here because (1) in view of the percentage arrangement, it looks primarily to an unsuccessful prosecution and (2) it was agreed to in 1955 when economic conditions differed and when counsel, no doubt, could not foresee the extent of this litigation.

20. The fee awarded is slightly more than 1 percent of the trebled damages.

21. While Donovan's fee arrangement with Hanover originally provided that Donovan would take care of the cost of local counsel if there were to be a recovery, this originally contemplated that local counsel from Hanover, Pa. would be engaged. Subsequently, it was determined that local counsel from Scranton, Pa., the situs of most of the proceedings, would be necessary. Accordingly, this part of the fee arrangement was orally rescinded and it was agreed that the cost of local counsel would be borne by Hanover.

an obligation to sell; that in the Government case the lease-only system was not found to be in violation of the antitrust laws; that before the effective date of the decree there was no obligation to sell; that the reference to sale in the decree was remedial, and prospective only, with a view toward diminishing United's market power; and that these things being true, there is no basis for the decision in favor of Hanover. United argues that these matters are apparent from the language of the decree itself and "does not require interpretation from the language of the opinion, findings and conclusions"; from certain passages in the voluminous trial record in the Government case; and from indications given by Judge Wyzanski in a colloquy preceding his denial on May 28, 1965, of United's application to the United States District Court for the District of Massachusetts, to construe or amend the decree in the Government case in accordance with United's contentions.

These contentions were urged upon and considered by this court prior to its decision. If this were merely an attempt to reargue these matters, the motion would be dismissed. United, however, in its motion affidavit has brought to the attention of this court for the first time certain passages in the Government case and in the colloquy. Hanover has not raised the question of whether this motion is properly brought pursuant to the "All Writs Act," 28 U.S.C.A. § 1651, or whether it conforms to Rule 59.

This court found that in the Government case the court held that United had monopolized trade in shoe machinery during the statutory period; and that the lease-only system was a monopolistic practice by the aid of which United maintained its monopolistic position. This court then concluded that United had a duty to abandon that policy or, to put it in another way, to refrain from illegal trade practices.[22]

There is nothing in the decree itself which compels a different conclusion. Judge Wyzanski did not hold, as United contends, that United monopolized the shoe machinery trade by the restrictive clauses and administration of the service clause. Rather he made a general finding that United monopolized the shoe machinery trade and commerce among the several states. He then described the lease clauses as practices which "are declared to have been means whereby defendant monopolized the shoe machinery market." But he did not say these were "the only" means or even "the" means. Yet United would have this court stop with this language, and ignore the rest of the decree. It is a familiar rule that in construing a document, a section should not be read in isolation from the whole. Cf. Richards v. United States, 1962, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L. Ed.2d 492; Ideal Farms, Inc. v. Benson, 3 Cir. 1961, 288 F.2d 608.

United argued in its brief on the merits, and now on the basis of passages from the record in the Government case, that Judge Wyzanski, both in his approach and in his findings, conclusions and opinion, separated the sale question from other questions. It calls attention to the language in the opinion designated "Opinion on Remedy." Even if it were clear that Judge Wyzanski intended to sectionalize his opinion, there is convincing language in the sections on "Effects of the Leasing System" and "Opinion on Alleged Violations" to support this court's construction.[23]

Judge Wyzanski's remarks during the May 28, 1965, colloquy also do not compel a different conclusion. In denying United's application from the bench Judge Wyzanski said that if he did have the power to grant the requested relief, he would not do it because the application was too late both with respect to Hanover and to other litigants. He also said he was loathe to take any action which could result in an undercutting of the decision of another district court. He noted the remedies available by way of

---

22. See, for example, pp. 279, 266, 272, 277.

23. See footnote 3, supra.

appeal and also the doubtful question of his power to act.

In denying the application, however, Judge Wyzanski said, " * * * I cannot understand how any person who was familiar with the whole course of this litigation could have any doubt whatsoever as to what had been my view of the conduct of the defendant, of the degree to which it had violated the Act and the degree to which the Decree was addressed *beyond eliminating violations* to setting forth a program of future conduct which would *make it hereafter less likely that the violations could continue.*" (Emphasis supplied.) This is a clear statement that the decree can be read retroactively and prospectively.

▆ There is nothing in the colloquy to cause this court to change its construction of the decree, or to certify questions regarding its construction to the District of Massachusetts. The request is made belatedly not only to that court but also to this court. Even if this court were inclined to certify these questions to that court, this procedure should not be followed. The cases cited by United are distinguishable. The situation is unlike that in which a federal court withholds decision until a controlling issue of state law is decided by a state court. One sovereign is attempting to ascertain the law of another sovereign from the best possible source—the courts of the sovereign whose law is sought to be ascertained. The important thing is that the state court proclaims state law. This is not true here. As pointed out by Judge Wyzanski, if the application is proper, and if he were incapacitated, then some other judge of the District of Massachusetts should be asked to construe the decree merely because the opinion issued from that court.

This conclusion finds support in American Securit Co. v. Shatterproof Glass Corp., D.Del.1958, 166 F.Supp. 813, aff'd 3 Cir. 1959, 268 F.2d 769, cert. denied 1959, 361 U.S. 902, 80 S.Ct. 210, 4 L. Ed.2d 157, where the Delaware District Court had reached a decision based on the construction of a decree of an Ohio district court and thereafter enjoined American Securit, a party to that decree, from seeking a construction of the decree in the Ohio court. The Delaware court conceded that the Ohio court was peculiarly competent to construe the decree but pointed to the duplication of judicial effort and inconvenience and expense which would result if one party, after a decision has been rendered, is permitted to seek a different construction, especially where that party, being aware of his opponent's contentions, did not seek a timely construction of the decree. Subsequently, the Ohio court, without American Securit's participation and on its own initiative, construed its decree and reached a result different from that of the Delaware court. In affirming the judgment of the Delaware court, the court of appeals specifically noted that the author of the decree of the Ohio court construed it contrary to the Delaware court but said that it could not agree with this construction even though such construction was entitled to great weight. These same considerations apply here. While American Securit had chosen the Delaware court as the forum, this does not alter the result because Hanover had a right to choose this court as its forum, had obtained a decision, and should not now be required to relitigate the same matters.

One additional point requires brief mention. United stressed that a judgment of dismissal upon the merits was entered against W. B. Coon Co., a shoe manufacturer, and in favor of United in the United States District Court for the Western District of New York, and the complaint therein was practically a copy of the complaint in the instant action. A review of the findings of fact in that case show Coon failed to introduce evidence that it would have purchased machines; that it had the means to do so; that it was dissatisfied with the leasing system; that United's acts caused damage to Coon; that lease prices were excessive; and that computed purchase prices and adjustments would have resulted in a fair and reasonable damage computation.

Hanover's recovery is not based on excessive returns to United, and the other deficiencies in proof the in Coon case have been supplied.

The motion will be denied.